STATE OF NORTH CAROLINA v. STEPHEN CARL SILHAN

No. 82

(Filed 30 July 1979)

1. **Jury § 2.1— denial of special venire from another county—publicity of other offenses**

   The trial court in a prosecution for kidnapping, crime against nature, and assault with intent to commit rape did not abuse its discretion in the denial of defendant's motion for a special venire from another county because of alleged radio, television and newspaper publicity in the county of trial concerning defendant's arrest for subsequent offenses in another county.

2. **Criminal Law § 66.5— lineup—no right to counsel**

   Defendant was not entitled to be furnished counsel at a lineup where the court found upon supporting evidence that he voluntarily appeared in the lineup at a time when he was not in custody, since a person's right to counsel at the time of a lineup confrontation attaches only at or after the initiation of adversary judicial criminal proceedings.

State v. Silhan

3. **Criminal Law § 66.5— lineup—waiver of counsel—absence of suggestiveness—independence of in-court identification**

The trial court properly refused to suppress lineup and in-court identifications of defendant because he was not represented by counsel at the lineup where the court found upon supporting evidence (1) that the State had fully advised defendant of his rights under *Miranda*, that he was not required to appear in the lineup, and that he had the right to have an attorney present at the lineup; (2) that the State showed by clear and convincing evidence that defendant voluntarily waived his right to counsel; (3) that the lineup was fair and reasonable with no police suggestiveness; and (4) that the in-court identifications were based solely upon the witnesses' recollections of the events in question.

4. **Constitutional Law § 30; Bills of Discovery § 6— denial of motion for "favorable evidence"**

The trial court did not err in the denial of defendant's motion for "favorable evidence" in the form of statements made by the victims to a deputy sheriff so that he could see if there was any exculpation since defendant was not entitled to such disclosure under either G.S. 15A-904 or the principle enunciated in *Brady v. Maryland* that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, and since the "favorable evidence" defendant sought through discovery was brought out before the jury in testimony of the State's witnesses.

5. **Rape § 18.2— assault with intent to rape—sufficiency of evidence**

In this prosecution for assault with intent to commit rape, the State's evidence was sufficient to support an inference that defendant intended to rape the victim as well as to commit the crime against nature where it tended to show that, after tying the victim's hands, defendant removed all her clothing; when she told him "to take out [her] tampax if he was going to do anything," he pulled it out and threw it away; and defendant then forced the victim to perform oral sex on him.

6. **Kidnapping § 1.3— instructions—substantial time period or distance not required**

It would have been improper for the court to have charged that in order to constitute kidnapping under G.S. 14-39(a) any unlawful confinement, restraint, or removal from one place to another must involve a substantial period or distance.

7. **Kidnapping § 1— constitutionality of kidnapping statute—conviction of kidnapping and rape**

The kidnapping statute, G.S. 14-39, prima facie violates no provision of the State or Federal Constitutions. Furthermore, the restraint, confinement and asportation of a rape victim may constitute kidnapping if it is a separate, complete act, independent of and apart from the rape.

Justices BRITT and BROCK took no part in the consideration or decision of this case.

State v. Silhan

APPEAL by defendant under G.S. 7A-27(a) from the judgment imposed by *Long, J.,* at the 10 October 1977 Session of CHATHAM County Superior Court. This case was docketed and argued as Case No. 93 in the Spring Term, 1978.

In four separate bills of indictment defendant was charged with (1) the kidnapping of Johnny Marvin Johnson, (2) the kidnapping of Suzanne Daniel Johnson, (3) crime against nature performed upon Suzanne Daniel Johnson and (4) assault with intent to rape Suzanne Daniel Johnson. The jury found defendant guilty of all four offenses. Evidence for the State tended to show:

About noon on Saturday, 25 September 1976, Johnny Marvin Johnson and his wife Suzanne Daniel Johnson, both over 16 years old, were fishing in the Buckhorn Dam area of Chatham County. The Dam area was almost deserted and, except for some children fishing above the dam, they saw no other person except defendant. Johnny testified, "I first observed another person when we were fishing below the dam. He was walking from the dam toward us and would fish every now and then. That person was Mr. Silhan. He had on blue jeans, a shirt, a camouflage coat and black boots. He was wearing dark glasses." Later that afternoon the Johnsons having had little success fishing, decided to return home. On the way to their car, which was in a parking area above the river, they passed the person they had seen fishing. Johnny was walking ahead of Suzanne when he "heard something that sounded like a person running" behind him. He turned around and saw that this man had grabbed Suzanne "around the neck and had a gun pointed to her head."

Suzanne described the assault as follows: "The man told Johnny to break open his gun and take the shells out and lay it on the ground. Johnny was carrying a tackle box and shotgun at the time. The man then told Johnny to go to the blue van which was parked in the parking area with the cars. When we got to the van he told Johnny to lay down flat on his stomach on the floor of the van. He then gave me some long rope or nylon cord and told me to tie Johnny's hands. After I tied Johnny, the man then tied my hands, got into the driver's seat and drove a short distance away.

"After the van came to a stop, he took off his belt and wrapped it around Johnny's legs. He then blindfolded Johnny and put

something in his mouth. The man then covered Johnny with some green clothes that were laying in the van. Then he came over to me and pulled my T-shirt over my head. He removed my britches, shoes, socks and underwear. After he pulled my bra down I told him to take out my tampax if he was going to do anything. He pulled it out and threw it out the back of the van.

"The man next pulled down his britches and took out his private parts and put it in my mouth. He told me that if I didn't swallow it he would kill us. When he reached a climax he untied my hands and told me to dress. He released us and told us to run toward the creek and left." After getting safely away from their assailant the Johnsons drove home and immediately reported the incident to the county sheriff.

The Johnsons described their assailant to the police and, in accordance with their description, an SBI agent made a composite picture of the man who had assaulted Suzanne and kidnapped them. They also provided a description of his van: blue with plaid seats, a bluish rug, a torn latch decal on the rear doors, and a North Carolina license plate with a military decal on the bumper. Later, when shown a photographic lineup which did not include a picture of defendant Silhan, the Johnsons did not identify any of the photographs as being of their assailant. However, at a lineup in Sanford on 4 May 1977, independently of each other, both Suzanne and Johnny Johnson identified defendant. They also made in-court identifications of defendant.

Two Wildlife Resources Commission enforcement officers who work at the Buckhorn Dam area testified that in May of 1976 they had seen a blue Chevrolet van with a Fort Bragg decal on the bumper parked in the area and that they had also seen defendant carrying a rifle and a side arm. The van these officers saw fitted the description provided by the Johnsons, and it was eventually traced to the defendant.

Defendant was a soldier stationed at Fort Bragg, and he and his wife Connie Silhan lived in Sanford, North Carolina. Defendant offered the following evidence which tended to establish an alibi:

On the day of the assault and kidnapping he was not required to be at the base. At approximately 9:30 a.m. he and his friend

Bobby Moore left his home and drove his blue van to the Economy T.V. and Appliance Company where defendant's wife worked. There he exchanged car keys with his wife and drove her Plymouth "Baracuda" back to their home. Defendant and Bobby Moore planned to sand Mrs. Silhan's automobile in preparation for a painting. When the compressor which powered the sander was found to be inadequate they went to Coggin's Heating and Air Conditioning business to use a larger compressor. They remained on the Coggin's premises from 11:00 or 11:30 a.m. until almost 5:00 p.m., when the two men returned to defendant's home. Defendant testified that he did not drive the van again that day after leaving it with his wife at work, nor did he drive the van to Buckhorn Dam at any time on 25 September 1976.

On cross-examination defendant admitted that prior to September 1976 he had driven his van to the Buckhorn Dam area, and that he always carried his guns. Notwithstanding, on redirect examination, defendant stated that on 25 September 1976 his pistol was not in his possession, but was at the home of his father-in-law. Defendant's mother-in-law, Mrs. Violet Mae Wicker, corroborated this assertion by testifying, "The gun was in my house in September of 1976."

Defendant's wife also corroborated his story and testified that he and Bobby Moore arrived at her place of employment on 25 September 1976 at approximately 9:30 a.m. At that time defendant told her he was leaving the van with her so that he could sand her car. The van was parked on the corner outside and she could see it from where she stood at work. About noon that day Connie Silhan and a friend drove by Coggin's, where they saw defendant working on the car. When Connie returned to her work that afternoon the van had not been moved, and when she "got off work at approximately 3:15 to 3:30" she drove the van "straight home." Defendant was not there, but he arrived around 4:30 or 4:45 p.m. and did not leave home again that day. Bobby Moore also remained at defendant's house watching television, eating "some sandwiches, and drinking Pepsi, Coke and things like that" until 10:30 or 11:00 p.m.

Bobby Moore testified that although he remembered helping defendant sand Mrs. Silhan's car, he could be no more specific about the date than to say it occurred in "September of '76." However, Clyde Moore, Bobby's father, testified that on 25

September 1976 he saw defendant and his son Bobby at Economy T.V. and Appliance. Clyde Moore was certain of the date because he was working "on an odd-type dryer" that day and had checked his records to verify the date. He further testified that defendant did indeed leave the blue van with Mrs. Silhan at work and that no one could have moved the van prior to Mrs. Silhan's departure, because it was impossible to back out the van. "She was [only] able to drive it home that day by waiting until the man at the barber shop moved his car so she could pull out of the parking place."

The jury having found the defendant guilty as charged in each of the four indictments returned against him, the judge imposed the following sentences: For the kidnapping of Suzanne Johnson, imprisonment for life; for the kidnapping of Johnny Johnson, imprisonment for not less than 20 nor more than 25 years to commence at the expiration of the life sentence; for crime against nature performed upon Suzanne Johnson, 10 years' imprisonment to run concurrently with the kidnapping sentence; and, for the assault upon Suzanne Johnson with intent to commit rape, 10 years' imprisonment also to run concurrently.

*Rufus L. Edmisten, Attorney General, and Thomas B. Wood, Assistant Attorney General, for the State.*

*Jimmy L. Love for defendant.*

SHARP, Chief Justice.

[1]  Defendant's first assignment of error is to the trial judge's denial of his motion, made under G.S. 15A-958, for a special venire from another county. In his motion defendant asserted that because of radio, television and newspaper publicity with reference to "his arrest for subsequent offenses in Cumberland County[1], the general feeling in Chatham County is that he is guilty" of the crimes for which he has been indicted. Upon the voir dire, in support of his motion defendant called the following witnesses:

---

1. The record in this case does not reveal the time of defendant's arrest or the nature of the crimes with which he was charged in Cumberland County. Our records, however, reveal that he was arrested in Cumberland on 20 September 1977 upon charges of first-degree murder, first-degree rape, and assault with a deadly weapon with intent to kill inflicting serious injury. *State v. Silhan,* 295 N.C. 636, 247 S.E. 2d 902 (1978).

(1) A high school junior who, in consequence of conversations with his family and friends, testified he did not believe defendant could have a fair trial in Chatham County but thought he himself "could sit on the jury and decide guilt or innocence based on the evidence presented at trial";

(2-3) Two employees of the Pittsboro Herald who, from what they had heard, thought defendant was guilty as charged and believed he could not get a fair trial in Chatham. One, who had discussed the case with her friends but had not heard a discussion "on the street," said she did not know why she thought so, but she "just didn't think" defendant could get a fair trial in Chatham. The other, a typesetter, said "[T]he offense is emotionally charged . . . I have a feeling about things happening close to home, things happening in Chatham County."

(4) A photographer for WRAL Television, a station which covers 19 counties, including Chatham, said that at the time of defendant's arrest in Cumberland he took two short films of about 20 or 30 seconds. One film showed him entering the law enforcement center; the other, the courthouse. The purpose of the films was "just to show him [defendant]." The photographer testified that in his opinion "the coverage of Silhan was within the normal limits of news reporting . . . [it] just recited that he was charged with certain crimes and his name and when he was arrested. Nothing inflammatory about it. There were no interviews of sheriffs or attempted interview of Silhan, or attorneys."

The State's rebuttal evidence consisted of the testimony of three members of the Chatham County Sheriff's Department. In brief summary, they testified that in the course of their duties they went about the county among its citizens; that outside the sheriff's office they encountered very little discussion of the case. One had heard none at all. One said, "There just hasn't been much discussion of this case with me. I haven't been asked directly about the case." The third first learned that Silhan was charged with murder and rape in Cumberland when he "was called to go to Fayetteville and pick him up." The consensus was, "Silhan can receive a trial in Chatham County by a fair and impartial jury."

It is well settled in this jurisdiction that "[a] motion for change of venue or a special venire is addressed to the sound

discretion of the trial judge, and an abuse of discretion must be shown before there is any error." *State v. Blackmon*, 280 N.C. 42, 46, 185 S.E. 2d 123, 126 (1971). *Accord, State v. Boykin*, 291 N.C. 264, 229 S.E. 2d 914 (1976); *State v. Ray*, 274 N.C. 556, 164 S.E. 2d 457 (1968). The evidence in this case falls far short of establishing an abuse of discretion. Moreover, the record fails to show that any prospective juror had read any newspaper account, or seen or heard any other news releases pertaining to the case, or had been in any manner prejudiced against defendant. Our statement in *State v. Dollar*, 292 N.C. 344, 351, 233 S.E. 2d 521, 525 (1977), is applicable here.

"Nothing in the present record indicates an abuse of discretion in [the court's] ruling. The record does not show the defendant's examination of prospective jurors nor does it show that he exhausted the peremptory challenges allowed him by law. Apparently, jurors were found who were not aware of, or were not affected by, the publicity of which the defendant complains and nothing in the record indicates that, prior to verdict, he was not content with the twelve jurors who found him guilty." *Accord, State v. Mitchell*, 283 N.C. 462, 196 S.E. 2d 736 (1973). Assignment No. 1 is overruled.

Defendant's second assignment of error is to the trial judge's refusal to suppress the Johnsons' in-court and out-of-court identifications of defendant. His primary objection to the identification procedures is that he did not have counsel present at the time the Johnsons identified him in the lineup. He also contends that the lineup was so "impermissibly suggestive" that it tainted the Johnsons' subsequent in-court identification. These contentions do not withstand scrutiny.

At the voir dire following defendant's motion to suppress, Detective Larry Hipp testified in brief summary as follows:

On 11 May 1975, approximately eight months after the incident at Buckhorn Dam, Detective Hipp stopped defendant, who was driving his van on Highway No. 87. Hipp requested defendant to accompany him to the Sanford Police Station. Defendant agreed to go and Hipp rode with him in the van. They arrived at the police department about 5:30 p.m. Defendant was then advised that he was a suspect in a crime and asked to be in a lineup. At that time he was fully advised of his constitutional rights as

delineated in *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed. 2d 694, 86 S.Ct. 1602 (1966), and thereafter he signed the waiver of rights form. Hipp said, "We advised him he didn't have to be in a lineup if he didn't want to be, but we would like for him to be. . . . It was decided at this time that he would go home, change clothes, and return after he got a sandwich. I drove to his home behind him . . . [but] did not stay at his home while he changed clothes or ate." The police suggested that defendant change his apparel because he had been in "army clothes" and they knew they "wouldn't be able to find people in town dressed the same way he was or near the same way to put in the lineup."

When defendant voluntarily returned to the police station about 7:00 or 7:30 p.m. he was again advised, this time orally, "that he did not have to be in the lineup and that he was entitled to have his attorney present." Defendant declared that "he didn't need one at this time." The lineup, conducted about 8:30 p.m., consisted of six white males, similar to defendant in height, weight and coloring. Because defendant wore dark glassses, the officers procured dark glasses for all the other participants. To show the lineup's character, Detective Hipp identified two photographs of it which were introduced in evidence.

The Johnsons, who had been requested to come to Sanford "to see if the person who committed the crime against them was in the lineup," viewed the lineup separately. Johnny first viewed the six people in the lineup and identified defendant Silhan by number. Hipp neither approved nor disapproved his selection; nor did he tell Johnson the name of the man whom he had identified. Hipp "then took Johnny Johnson back and brought his wife down to view the lineup." She also identified Silhan by number. Thereafter, "the people in the lineup were shifted numerically and mixed up." Johnny was brought back, and this time each member of the lineup was instructed to step forward and say, "break the gun down." When Silhan stepped forward and uttered that phrase, Johnson said, "That's definitely him, there's no doubt." Hipp brought Suzanne Johnson back and the whole procedure was repeated. When Silhan stepped forward and said, "break the gun down," she started crying and said, "That's him."

Johnny and Suzanne Johnson each testified that his identification of defendant at the lineup was based solely upon his

observations during the kidnap and assault; that no officers had in any way influeced their identification of defendant at the lineup.

Defendant's version of the events on the day of the lineup parallels Detective Hipp's statements with one exception. Defendant concedes that he signed the waiver of rights form shortly after he arrived at the police station; that when he left the police station and went home to change clothes and eat, he knew he had a choice of not going back. He denies, however, that anything was said to him about an attorney at the time of the lineup. Defendant was put under arrest after the lineup and he employed his own attorney that night.

[2, 3] Based upon the foregoing evidence the trial judge found that defendant had voluntarily appeared in the lineup at a time when he was not in custody. Thus, even in the absence of a waiver, it was not required that defendant be furnished counsel at the lineup. A person's right to counsel at the time of a lineup confrontation depends upon whether the proceeding is still in the investigatory stage or has become a criminal prosecution. The right to counsel attaches only "at or after the initiation of adversary judicial criminal proceedings—whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *State v. Finch*, 293 N.C. 132, 140, 235 S.E. 2d 819, 824 (1977). *Accord, Kirby v. Illinois*, 406 U.S. 682, 32 L.Ed. 2d 411, 92 S.Ct. 1877 (1972). The judge further found (1) that the State had fully advised defendant of his rights under *Miranda*, that he had not been required to appear in the lineup, and that he had been informed of the right to have an attorney present and had waived that right, and (2) that the lineup was fair and reasonable with no police suggestiveness. The judge concluded that the Johnsons' identification of defendant was based soley upon their recollection from events of 25 September 1976, and that the State had shown "by clear and convincing evidence that the defendant voluntarily, knowingly and intelligently waived the presence of an attorney at the lineup." The record evidence and the law amply support the court's findings. They are therefore binding on this Court. *State v. Roseman*, 279 N.C. 573, 184 S.E. 2d 289 (1971). Defendant's assignment No. 2 is overruled.

[4] Assignment of Error No. 3 addresses the trial judge's denial of defendant's motion for "favorable evidence." On 19 September

1977 defendant filed a motion requesting that the State provide him with copies of any and all evidence in its possession "that might tend to exculpate him in any way." The State responded that it had no such evidence. Following the voir dire on defendant's other pretrial motions, defendant narrowed his request by asking for the statements Mr. and Mrs. Johnson made to one of the deputies "so that he could see if there is any exculpation." The judge denied the motion "on the grounds that it is a general or broadside motion and not a specific request for discovery."

Although perhaps not entirely correct in his assessment of defendant's motion, the judge did not commit prejudicial error in denying it. Defendant was not entitled to this disclosure under either G.S. 15A-904 (1978) or the principle enunciated in *Brady v. Maryland* that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87, 10 L.Ed. 2d 215, 218, 83 S.Ct. 1194, 1196-97 (1963). Under *Brady* the district attorney's conduct would constitute prejudicial error only if "there was (a) suppression by the prosecution after a request by the defense (b) of material evidence (c) favorable to the defense." *State v. Gaines*, 283 N.C. 33, 45, 194 S.E. 2d 839, 847 (1973).

Defense counsel asserts that defendant's motion for favorable evidence "went directly" to the Johnsons' testimony at trial. He suggests that there were two discrepancies in the Johnsons' testimony at trial and the statements they made to Deputy Sheriff Shaner shortly after the incident at Buckhorn Dam. An examination of the record, however, makes it clear that each of the two items of "favorable evidence" defendant had sought through discovery was thereafter brought out before the jury in the testimony of State's witness, Deputy Sheriff Whitt, and the cross-examination of Johnny Johnson himself.

First, defendant contends that had Deputy Shaner's notes on the Johnsons' account of the events of 25 September 1976 (which she transcribed that same day) been made available they would have shown that Johnny had originally described their attacker's van as a Ford and not a Chevrolet, as he later testified. However, on cross-examination Johnny testified that when he made his

statement to Mrs. Shaner he had indeed told her that defendant's van was a Ford, but after he had compared Ford and Chevrolet vans and noted the difference between them—particularly on the inside—he "made up his mind it was a Chevrolet van" and so informed the officers.

Second, defendant asserts that, after telling Deputy Shaner they had seen "another man at the river other than the defendant" that day, Johnny testified on cross-examination that he didn't remember telling Mrs. Shaner that Mr. Silhan was talking to another guy; that he didn't see anybody before the incident besides Mr. Silhan, himself and his wife. Once again, defendant could not possibly have suffered any prejudice from the lack of Mrs. Shaner's notes. Deputy Sheriff Whitt, a witness for the State, testified on cross-examination as follows: "On September 25th I asked Mr. and Mrs. Johnson to tell me exactly what they could about the incident and Mrs. Shaner took notes. I recall that they said they did or thought they saw the subject talking to another guy—that was fishing. Mr. Johnson stated that a green army belt was used to tie his legs."

[5] Defendant's assignments 6 and 7 challenge the trial judge's denial of his "motion to dismiss at the close of the State's evidence and again at the close of all the evidence, in particular with respect to the charge of assault with intent to commit rape." Defendant contends that all the evidence tends to show that the assailant's only intent was to force Mrs. Johnson to perform oral sex on him and that he never intended to rape her.

The following statement of the law is clearly applicable to this case:

"To convict a defendant on the charge of an assault with an intent to commit rape the State must prove not only an assault but that the defendant intended to gratify his passion on the person of the woman, at all events and notwithstanding any resistance on her part. It is not necessary that defendant retain that intent throughout the assault; if he, at any time during the assault, had an intent to gratify his passion upon the woman, notwithstanding any resistance on her part, the defendant would be guilty of the offense. 'Intent is an attitude or emotion of the mind and is seldom, if ever, susceptible of proof by direct evidence; it must ordinarily be proven by circumstantial evidence, *i.e.*, by

facts and circumstances from which it may be inferred.' . . . To convict a defendant of an assault with intent to commit rape 'an actual physical attempt forcibly to have carnal knowledge need not be shown. (Citation omitted.)" *State v. Hudson,* 280 N.C. 74, 77, 185 S.E. 2d 189, 191 (1971), *cert. denied,* 414 U.S. 1160 (1974).

Albeit the mental processes of the sexual assailant in this case are beyond comprehension, the inconsistency between his contentions here and his actions at the scene of his crimes is patent. After tying Mrs. Johnson's hands defendant removed all her clothing. Then when she told him "to take out [her] tampax if he was going to do anything," he pulled it out and threw it out the back of the van. Such evidence clearly supports the inference that defendant's ultimate intention was not just to commit the crime against nature, but rape. The motions to nonsuit were properly overruled.

[6]   In his assignments Nos. 8, 9, and 10, defendant charges as error the failure of the trial judge to charge the jury that in order to constitute kidnapping under G.S. 14-39(a) (Cum. Supp. 1977) any unlawful confinement, restraint, or removal from one place to another must involve a substantial period or distance. These assignments require little discussion for they are based upon disapproved dictum in the opinion of the Court of Appeals in *State v. Fulcher,* 34 N.C. App. 233, 237 S.E. 2d 909 (1977), a case in which that court *affirmed* the defendant's conviction of two charges of crime against nature and kidnapping. Although the defendant Fulcher took no exceptions to the charge in his case, and the charge was not in the record, in its opinion the Court of Appeals reviewed the North Carolina Pattern Instruction on Kidnapping (Crim. 210.10, revised January 1976) and found them insufficient. It concluded that if the charge against the defendant is kidnapping by unlawful confinement or restraint, the trial judge in instructing the jury must define those terms as meaning confinement or restraint for a substantial period and not merely incidental to the commission of another crime; that if the charge is kidnapping by moving from one place to another, the judge must define the term as meaning movement from one place for substantial distance and not merely incidental to the commission of another crime. *Id.* at 241, 237 S.E. 2d at 915.

Upon Fulcker's appeal this Court also affirmed his convictions, but disapproved the Court of Appeals' construction of G.S.

14-39(a) and its proposed instructions to juries summarized above. *State v. Fulcher*, 294 N.C. 503, 243 S.E. 2d 338 (1978). In a unanimous opinion written by Justice Lake, we held that in enacting G.S. 14-39(a) (effective 1 July 1975) the legislature intended to change the law which this Court had previously enunciated with reference to the requirements of restraint and asportation in kidnapping. "It follows," the Court said, "that the Court of Appeals erred in its holding that 'substantiality' in terms of distance or time is an essential of kidnapping and in its pronouncements that the trial judge must instruct the jury that 'confinement' or 'restraint,' as used in this statute, means confinement or restraint 'for a substantial period' and that 'removal' as used in this statute, requires a movement 'for a substantial distance.' We, therefore, cannot approve the instructions to juries proposed by the Court of Appeals upon these points. *Id.* at 522-23, 243 S.E. 2d at 351.

Defendant's conduct, as detailed by Johnny and Suzanne Johnson, clearly constituted kidnapping under G.S. 14-39(a) and the court's charge correctly applied the law to the evidence in this case. Assignments 8, 9, and 10 are therefore without merit. However, before leaving these assignments, we note that we have considered them despite counsel's failure to comply with App. R. 10, particularly § (b)(2), and warn that this Court cannot be counted on to ignore routinely such a disregard of its rules.

[7]   Defendant's final contention is that G.S. 14-39 is "unconstitutional and if not, [then] under the facts of this case . . . the kidnappings [were] merely incidental to the other felonies of crime against nature and assault with intent to commit rape." This same contention was considered and overruled in *State v. Fulcher*, supra. In that case we held that prima facie the statute violated no provision of the State or Federal Constitutions. We further held that the restraint, confinement and asportation of a rape victim may constitute kidnapping if it is a separate, complete act, independent of and apart from the rape. In this case it is clear that the confinement, restraint and asportation of both Mr. and Mrs. Johnson were separate offenses from the sexual assault of Mrs. Johnson. Assignment No. 11 is overruled.

In defendant's trial we find

No error.

Justices BRITT and BROCK took no part in the consideration or decision of this case.