STATE OF NORTH CAROLINA v. STEPHEN KARL SILHAN

No. 93

(Filed 4 March 1981)

**1. Indictment and Warrent § 13; Homicide § 12.1— felony murder or premeditation and deliberation — motion for bill of particulars**

The trial court did not err in the denial of defendant's motion for a bill of particulars requiring the State to declare prior to trial whether it would prosecute a first degree murder indictment on a theory of premeditation and deliberation or felony murder since the murder indictment and the separate indictment charging the accompanying felony set out sufficient factual information to enable defendant to understand the basis of the State's cases against him, and since the State is not generally required to elect between legal theories in a murder prosecution prior to trial.

**2. Indictment and Warrant § 8.4; Homicide § 12.1— felony murder or premeditation and deliberation — motion to require election by State**

The trial court did not err in the denial of defendant's motion that the State elect at the close of the evidence which theory of first degree murder would be submitted to the jury where the evidence was sufficient to establish a *prima facie* case as to both felony murder and murder with premeditation and deliberation, since it became the responsibility of the jury to weigh the evidence to see if it warranted a finding that defendant was guilty of murder in the first degree upon either or both theories.

**3. Searches and Seizures § 23— sufficiency of affidavit for search warrant**

An affidavit for a search warrant, including allegations that the print of the right rear wheel of a vehicle was found in mud at the crime scene, that a blue van was observed at the crime scene, and that defendant was operating a blue 1976 Chevrolet van at the time of his arrest, was sufficient to enable the magistrate to find probable cause for the issuance of a warrant to search defendant's van and seize the right rear tire thereof.

**4. Constitutional Law § 63; Jury § 7.11— exclusion of jurors for capital punishment views — cross-section of community — due process**

Defendant was not denied a fair trial before a representative cross-section of the community in violation of the Sixth Amendment by the denial of his motion that the district attorney be prohibited from inquiring into potential jurors' attitudes toward capital punishment and from excusing prior to the sentencing phase any jurors who said unequivocally that they could not impose the death penalty; nor was defendant denied due process on the ground that death-qualified juries are prosecution prone.

**5. Jury § 7.7— challenge for cause — renewal of challenge after exhausting peremptory challenges**

Even if it was error for the trial judge to deny the defendant's challenges for cause to two prospective jurors, defendant may not complain on appeal where he

failed to renew his challenge for cause of either juror after having exhausted his peremptory challenges as required by G.S. 15A-1214(h) and (i).

**6. Constitutional Law § 30; Criminal Law § 80.2— exculpatory evidence not disclosed to defendant — motion to examine prosecutor's file — disclosure order — offer of recess**

When it came to light at trial that an FBI report showing that none of the fingerprints taken at the crime scene could be identified as those of defendant had not been disclosed to defendant pursuant to discovery, the trial court acted properly in offering to give defendant as much of a recess as he needed to deal adequately with the report, ordering the district attorney to reveal to defendant any exculpatory evidence of which he had knowledge, and denying defendant's motion to examine the files of the district attorney for additional exculpatory evidence. G.S. 15A-910(2).

**7. Criminal Law § 99.3— recall of witness after bench conference — no expression of opinion**

In a rape and felonious assault case in which the victim's father testified about written notes given to him by the victim describing the crimes and the assailant, the recall of the victim's father after a bench conference to permit him to testify as to the unavailability of the notes in order to comply with the best evidence rule did not amount to an expression of opinion by the presiding judge in violation of G.S. 15A-1222.

**8. Criminal Law § 61.3— evidence of tire tracks — sufficiency of foundation**

A sufficient foundation was presented for the admission of testimony concerning tire tracks where the State introduced evidence tending to show that a plaster cast of a tire track had been made on a roadside near the crime scene; a blue Chevrolet van had been seen on the side of the road at or near the time of the crimes; defendant owned a van similar to the one seen; the cast was compared with a tire taken from the right rear wheel of defendant's van; and the tire track was such that defendant's van could have made it.

**9. Criminal Law § 50.1, 61.3— tire track identification — inability to make positive identification**

A witness's testimony that a tire print *could* have been made by defendant's vehicle was not rendered incompetent by the inability of the witness to state conclusively that defendant's tire made the print, since the inability of the witness to make a positive identification went only to the weight of his testimony.

**10. Criminal Law § 66— van identification procedure not unduly suggestive**

A van identification procedure was not unduly suggestive, and a witness was properly permitted to testify as to her identification of defendant's van, where the witness observed a light blue van parked along the side of the road near the crime scene on the afternoon of the crimes; the witness saw the van in broad daylight without any obstruction to her view; the witness was driven by a deputy sheriff to a law enforcement center parking lot where she observed several vans; she spontaneously identified one of the vans as being the one which she had seen near the crime scene; other witnesses established that the van selected by the witness

State v. Silhan

was the defendant's van; nothing suggested that defendant's van was displayed or portrayed in any manner which could reasonably be said to single it out for the witness's special attention; and neither the deputy sheriff with whom the witness rode nor any other law enforcement officer in any way directed her attention to defendant's van by conduct or speech.

**11. Criminal Law §§ 45, 66— van identification procedure not experiment**

A procedure in which a witness for the State identified defendant's van as being the vehicle which she had seen near the crime scene did not constitute an experiment; therefore, testimony concerning the van identification was not rendered inadmissible because of the State's failure to comply with established procedures governing the admission into evidence of experiments or because the prosecutor failed to inform defense counsel of the results of the identification procedure pursuant to G.S. 15A-903(e).

**12. Criminal Law § 43.1— photograph of defendant taken before crimes — competency**

In this prosecution for first degree murder, first degree rape, and felonious assault, a photograph of defendant taken one month before the crimes and testimony as to the circumstances surrounding the photograph were competent to show that within a month of the attack defendant wore a cap and glasses similar to that which one victim testified were worn by the man who attacked her.

**13. Bills of Discovery § 6— State's failure to produce photograph — exclusion not required**

A photograph of defendant was not required to be excluded from evidence because the State failed to produce it prior to trial pursuant to defendant's request for voluntary production where defendant failed to show that the photograph was in the State's possession, custody or control before the trial, and where defendant never requested that the photograph be excluded on the ground of the State's failure to comport with our discovery rules and did not ask for any other sanction permitted by the discovery statute. G.S. 15A-903(d).

**14. Criminal Law § 169.3— erroneous admission of evidence — admission of similar evidence without objection**

The admission of testimony or other evidence over objection is harmless when testimony or other evidence of the same import has previously been admitted without objection.

**15. Criminal Law § 89.3; Constitutional Law § 65— victim's prior written statements — rehabilitation of credibility — right of confrontation**

Prior written statements of a rape and assault victim who testified for the State were not hearsay and were properly admitted to rehabilitate the victim's credibility before the jury. Furthermore, defendant's right of confrontation was not denied because the written statements had not been disclosed to defense counsel prior to trial where the trial judge directed the district attorney to turn over to defendant any such statements, offered to grant a recess for such time as was necessary for defense counsel to study the statements, and offered to permit defense counsel to recall the victim or any of the State's witnesses for cross-

examination about the statements.

**16. Criminal Law § 42.3— admissibility of boots — showing of chain of custody not necessary**

An officer's testimony that boots offered in evidence were those he observed taken from defendant after defendant's arrest and that shoelaces contained in the boots when they were offered into evidence were those which he had noticed earlier constituted sufficient identification of the boots to permit them to be offered without showing a chain of custody,

**17. Criminal Law § 42— introducing exhibits not previously admitted**

The trial court did not err in permitting the prosecutor to introduce into evidence all exhibits not previously admitted rather than requiring that each exhibit be individually introduced where the record shows that defendant had an opportunity to interpose objections to every item of physical or documentary evidence shown to the jury during the trial, and that defendant was given the opportunity to object specifically to any item at the time the remaining exhibits were introduced into evidence.

**18. Constitutional Law § 30; Criminal Law § 80.2— allowance of motion to compel discovery — refusal to have material sealed for appellate review**

The trial court did not err in the denial of defendant's motion to have prior written statements of a rape and assault victim placed in an envelope and sealed for purposes of appellate review where the court allowed defendant's motion to compel discovery by directing the district attorney at trial to give the statements to defendant, the court offered to grant a recess so that defendant would have an opportunity to consider the statements, and the court offered to allow defendant to recall any witness whom he wished to examine concerning the statements.

**19. Criminal Law § 119— request for instructions — instructions given in substance**

The trial court did not err in failing to give defendant's requested instructions concerning the identification of defendant as the perpetrator of the crime and factors which the jury should consider in weighing the credibility of a witness's identification of defendant where the court in substance gave the requested instructions.

**20. Criminal Law § 113.1— instructions — summary of evidence — evidence brought out on cross-examination**

The trial court did not err in denying defendant's request that evidence brought out on cross-examination of State's witnesses be included in the court's summary of the evidence.

**21. Criminal Law § 118— charge on contentions of the parties**

It is not error for the trial judge to state the contentions of the parties provided the contentions of each litigant are stated fairly and accurately.

**22. Criminal Law § 114.2— instruction on elements of rape — insertion of additional evidence — harmless error**

State v. Silhan

If the trial judge erred in stating evidence that a rape victim's vagina had been injured and that semen was present while he was instructing on the elements of the various degrees of rape, such error was not prejudicial to defendant where it was not disputed that the victim had in fact been raped, and defendant relied on the defense that he was not the perpetrator.

### 23. Rape § 6— age of defendant — instructions on factors to be considered

The trial court in a rape case did not err in instructing the jury that, in determining whether defendant was sixteen years of age or older, the jury could consider the defendant's appearance and evidence as to whether he was operating a vehicle and was married.

### 24. Criminal Law § 112.4— lapsus linguae in instruction on circumstantial evidence

The trial court's *lapsus linguae* in stating during its instructions on circumstantial evidence that the jury should determine whether these circumstances "include" rather than "exclude" every reasonable conclusion except that of guilt did not constitute prejudicial error since it is apparant from a contextual reading of the charge that the jury could not have been misled thereby.

### 25. Criminal Law § 114.3— additional instructions — no expression of opinion

The trial judge's statement that he thought he had covered the matter earlier but would give additional instructions out of an abundance of caution did not constitute an expression of opinion.

### 26. Criminal Law § 26; Homicide § 31— conviction of first degree murder — failure of jury to specify theory — underlying felony merged into murder conviction

When a jury in a first degree murder trial is properly instructed upon both theories of premeditation and deliberation and felony murder and returns a first degree murder verdict without specifying whether it relied on either or both theories, the case is treated as if the jury relied upon the felony murder theory; therefore, the underlying felony merges into the murder conviction, and any judgment imposed on the underlying felony must be arrested.

### 27. Criminal Law § 135.4— first degree murder conviction — failure of jury to specify theory — underlying felony not aggravating circumstance

Where a first degree murder case was submitted to the jury upon both theories of premeditation and deliberation and felony murder and the jury did not specify the theory or theories upon which it relied in returning a guilty verdict, the underlying felony may not be considered as an aggravating circumstance in the penalty phase because it has merged with and become a part of the murder conviction as an essential element thereof.

### 28. Criminal Law § 135.4— first degree murder — sentencing hearing — aggravating circumstance of especially heinous, atrocious or cruel crime

The trial court should have submitted to the jury during the sentencing phase of a first degree murder trial the aggravating circumstance as to whether the crime was "especially heinous, atrocious or cruel" where the evidence tended to show that the victim was stripped from the waist down before she was mur-

dered; her hands were tied behind her back and her brassiere was tied around her neck; she was marched at knife point by her assailant into nearby woods where she was forced to lie on the ground; and she was beaten before she was murdered.

### 29. Criminal Law § 135.4— capital case — aggravating circumstance supported by evidence — no power by State to withdraw from jury's consideration

The prosecution in a capital case has no power to withdraw from the jury's consideration any aggravating circumstance which is in fact supported by evidence adduced at the guilt or sentencing phase of the trial; furthermore, the State is without power to agree to a life sentence or to recommend such a sentence to the jury during the sentencing phase when the State has evidence from which a jury could find at least one aggravating circumstance beyond a reasonable doubt.

### 30. Criminal Law § 26.9— new trial after appeal — double jeopardy

If a criminal conviction is reversed on appeal for insufficiency of the evidence, double jeopardy precludes remanding the case for a new trial even if the State has evidence which it could offer at a new trial but did not offer at the trial from which the appeal was taken. However, there is no such impediment in ordering a new trial when the first trial was tainted by mere "trial error."

### 31. Criminal Law §§ 26.9, 135.4— life sentence in capital case — appeal by State — new sentencing hearing — double jeopardy

If a life sentence is imposed following conviction for a capital crime, double jeopardy considerations prohibit an appeal by the State or the ordering of a new sentencing hearing on defendant's appeal of his conviction even if the life sentence was the result of trial error favorable to defendant.

### 32. Criminal Law §§ 26.9, 135.4— appeal of death sentence — remand for new sentencing hearing — aggravating circumstances which may be considered

If upon defendant's appeal of a death sentence the case is remanded for a new sentencing hearing, double jeopardy prohibitions would not preclude the State from relying on any aggravating circumstance of which it offered sufficient evidence at the hearing appealed and which was either not then submitted to the jury or, if submitted, the jury then found it to exist.

### 33. Criminal Law § 135.4— vacation of death sentence — remand for new sentencing hearing

If upon defendant's appeal the Supreme Court vacates a death sentence for trial error, it will remand for a new sentencing hearing only if there are aggravating circumstances which would not be constitutionally or legally proscribed at the new hearing. An aggravating circumstance would not be so proscribed at the new hearing if (1) there was evidence to support it at the hearing appealed from; (2) it was not submitted to the jury or, if submitted, the jury found it to have existed; and (3) there is no other legal impediment (such as the felony murder merger rule) to its use.

State v. Silhan

**34. Criminal Law § 135.4— death sentence vacated — remand for new sentencing hearing**

Upon vacating defendant's death sentence on a first degree murder conviction because the trial court erroneously submitted the underlying felony of rape as an aggravating circumstance, the Supreme Court will remand the case for a new sentencing hearing where there was evidence of the "prior felony" and "especially heinous" aggravating circumstances at the hearing appealed from and neither aggravating circumstance was submitted to the jury at the hearing. G.S. 15A-2000(e)(3) and (9).

**35. Criminal Law § 135.4— capital crime — proof of prior felony aggravating circumstance**

The most appropriate way to show the "prior felony" aggravating circumstance would be to offer duly authenticated court records, and the testimony of the victims themselves should not ordinarily be offered unless such testimony is necessary to show that the crime for which defendant was convicted involved the use or threat of violence to the person. However, if defendant denies that he was the defendant shown on the conviction record, the occurrence of the conviction, or that the crime involved the use or threat of violence to the person, then the State should be permitted to offer such evidence as it has to overcome defendant's denials.

**36. Criminal Law § 135.4— capital case — aggravating circumstance — defendant's bad character**

Although the State could not in its case in chief offer evidence of defendant's bad character as an aggravating circumstance in a capital case, the State could offer evidence of defendant's bad character to rebut evidence of his good character presented by defendant as a mitigating circumstance.

Justice MEYER did not participate in the consideration and decision of this case.

APPEAL by defendant from *Judge Fountain*, 8 March 1979 Criminal Session of COLUMBUS Superior Court.

Upon pleas of not guilty, defendant was tried upon two bills of indictment proper in form the first of which charged him with first degree murder and first degree rape (79-CRS-1943), and the second with felonious assault (79-CRS-1942). Defendant was found guilty as charged. For his conviction of first degree murder, defendant was sentenced to death. Defendant was also sentenced to life imprisonment for the crime of first degree rape. A sentence of twenty years was imposed on the felonious assault conviction. On 18 December 1979, we allowed defendant's motion to bypass the Court of Appeals on his appeal from the assault conviction. This case was docketed and argued as No. 3, Spring Term 1980.

*Rufus L. Edmisten, Attorney General, by Charles M. Hensey, Assistant Attorney General, for the state.*

*Mary Ann Tally and Fred J. Williams, Attorneys for defend-*

*ant appellant.*

EXUM, Justice.

Defendant brings forward numerous assignments of error relating to both phases of his trial.[1] After a careful consideration of these assignments, as well as the record which is before us, we find no error in the guilt determination phase of defendant's trial. However, for error in the sentence determination phase, we vacate defendant's death sentence on the first degree murder conviction and remand for a new sentencing hearing. We also arrest judgment on defendant's first degree rape conviction. We find no error in the felonious assault conviction and judgment.

I.

At trial, the state introduced evidence which tended to show: On 13 September 1977, between the hours of 5:00 p.m. and 6:00 p.m., passersby saw Barbara Lynne Davenport, age 17, stagger from a wooded area and collapse on Manchester Road in the city of Spring Lake, North Carolina. Her throat had been cut severely, and a wound of between four and five inches in length was visible. Ms. Davenport had also been stabbed in the back. Her hands were tied behind her with a shoestring, and her brassiere had been tied around her mouth and throat.

Unable to talk because of her throat injury, Ms. Davenport could nonetheless communicate through gestures and written messages. She indicated to her attendants that "my friend is in the woods." An ensuing search of an adjacent wooded area revealed the dead body of Mary Jo Nancy Coates, age 14, lying face down on the ground approximately twenty yards from the road. Ms. Coates was nude from the waist down; her hands were tied behind her back with a black bootlace; and her brassiere had been tied around her neck. Ms. Coates had received two knife wounds: one to the back and one to the chest. In the immediate area of the body, searchers found a pair of cut-off blue jeans and a pair of panties hanging in a tree. The items belonged to Ms. Coates. Searchers also found a pair of

---

[1] G.S. § 15A-2000(a)(1) provides that upon conviction or adjudication of guilt of a defendant of a capital felony, the trial court is obligated to conduct a separate sentencing hearing to determine whether the defendant should be sentenced to death or life imprisonment. A capital case is thus conducted in two phases—a guilt determination phase and a sentence determination phase.

tortoise shell glasses which belonged to Ms. Davenport and several smaller items near the body. A search of the area between the wooded area where the body was found and a nearby cornfield uncovered a laceless tennis shoe, an open bag of Doritos, several cigars and a pack of cigarettes. Another laceless tennis shoe was found in the cornfield itself. All of these items, as well as jewelry and clothing taken from the body of Ms. Coates, were taken into custody and preserved for trial.

The decedent and Ms. Davenport were close friends who lived in separate homes in a trailer park in Spring Lake. On the afternoon of 13 September 1977, the pair left Ms. Davenport's home to go to a convenience store located approximately a quarter mile from the trailer park. The girls shopped often at the convenience store and habitually took a path between the cornfield and the wooded area in making the trip to and from the establishment. The journey normally took between five and ten minutes each way. On this particular day, the girls purchased six packs of cigars for Ms. Davenport's father, as well as two packs of cigarettes for themselves and a bag of Doritos.

On their return trip from the store Ms. Coates and Ms. Davenport stopped in a clearing to smoke cigarettes. As they sat in the clearing with their backs to the convenience store, Ms. Coates pointed to a cluster of vines and brambles in the direction of the trailer park saying that someone was spying on them. Ms. Davenport looked to where her friend was pointing and saw a man wearing a fatigue cap and sunglasses standing about sixty feet away. Ms. Davenport got up from where she was seated and walked towards where the man was standing. He started walking away from the two girls down the path in the direction of the trailer park. Ms. Davenport went back to the clearing whereupon she and Ms. Coates proceeded to gather their belongings. The two women headed for home.

After Ms. Davenport and Ms. Coates had traveled some distance, they saw a man, apparently the same individual they had seen earlier, coming towards them on the path. He passed by the pair at an arm's length distance. As he passed by her Ms. Davenport was able to notice that he was wearing a fatigue cap, a camouflage jungle shirt, and sunglasses. The man had dark hair which was cut in a military fashion. As he passed by the girls he spoke to them. At the time of this encounter, Ms. Davenport was several feet ahead of

State v. Silhan

Ms. Coates as they walked together on the path.

A few moments later, Ms. Davenport heard a noise which caused her to stop walking. She turned to find Ms. Coates kneeling on the ground. The man they had passed on the path was kneeling behind Ms. Coates holding a knife to her throat. As Ms. Davenport looked on, the man told her to do what he said or he would kill Ms. Coates.

The assailant took off one of Ms. Coates' tennis shoes. Before he threw the shoe into the cornfield nearby, he removed the shoelace and used it to tie Ms. Davenport's hands behind her. At the time she was tied up Ms. Davenport was lying face down on the ground. The man then apparently, though not in Ms. Davenport's view, tied Ms. Coates' hands in similar fashion. Having bound the girls the assailant forced them into the woods.

Once they were in the wooded area away from the nearby highway, the man forced both Ms. Coates and Ms. Davenport to lie upon the ground. Ms. Davenport could not see what happened next, but she did hear her companion repeatedly say "no, no, no." Ms. Coates' protests continued for about half a minute. The assailant thereupon went over to Ms. Davenport. After sexually assaulting her, the man produced a knife which had a blade about a foot long with a dull finish. He used the knife to cut the straps of her brassiere and then used the garment to gag her mouth. The man then pulled both girls to their feet and forced them to walk about sixty feet to an area where the vegetation was particularly thick. Again, they were forced to the ground. Ms. Davenport could not see what happened next, but she heard the sound of a zipper, some jingling, and the screams of her friend. Ms. Davenport was able to get the gag out of her mouth, but the assailant came over to her and bound her again before he returned to Ms. Coates. Ms. Davenport then heard the man beating Ms. Coates. After a short while, he came back over to Ms. Davenport and began beating her about her back. The man then pulled Ms. Davenport's head up from the ground as the rest of her body still lay flat. With his knife in his right hand, the man pulled the knife across her neck several times. Despite her struggling, the man stabbed Ms. Davenport in the back twice. At that point, though she was still conscious, Ms. Davenport stopped struggling and pretended to be dead.

After several minutes, Ms. Davenport was able to get to her

State v. Silhan

feet and spit the gag out of her mouth. As she got up to leave the area, Ms. Davenport noticed that Ms. Coates was nude from the waist down with her hands tied behind her. She was still. Ms. Davenport went down the path in the direction of Manchester Road where she collapsed.

As passersby attended to her, Ms. Davenport was able to provide them with a rough description of her assailant. Over the course of the next several days, while she was hospitalized, Ms. Davenport assisted law enforcement officers in developing a composite drawing of the man who had attacked her and her friend. On 20 September 1977 several police officers visited Ms. Davenport in the hospital and showed her a number of photographs. At that time, she identified a photograph of defendant as being that of her assailant. At trial, Ms. Davenport again positively identified defendant as her assailant.

Defendant was a sergeant in the United States Army. From 10 September 1977 until 13 September 1977, defendant's unit was on field training manuevers at Camp Hill, Virginia. Members of his unit observed defendant having in his possession an old bayonet which was approximately twelve to fourteen inches long. Defendant was also seen wearing sunglasses during the encampment. At approximately 4:30 a.m. on 13 September, defendant left Camp Hill to return to Fort Bragg, North Carolina via the morning chow truck. When he left he was wearing a fatigue cap and camouflage shirt. Defendant arrived at Fort Bragg at approximately 3:50 p.m. that same day and went immediately to the motor pool where he picked up his light blue Chevrolet van. Defendant was seen at Fort Bragg around 5:00 p.m. leaving his barracks. A light blue Chevrolet van was independently observed by two persons shortly after 5:00 p.m. on 13 September in the area where the two girls were attacked. The van was seen on Manchester Road, parked on the same side of the road as the wooded area where the women were assaulted. After the photographic lineup was conducted on 20 September 1977, defendant was arrested at a shopping center in Spring Lake. At the time of his arrest defendant was driving his light blue Chevrolet van.

Defendant offered no evidence during the guilt determination phase of trial.

Upon receiving from the jury verdicts finding defendant guilty

of first degree murder, first degree rape, and assault with a deadly weapon, the court convened the sentence determination phase of trial before the same jury pursuant to the provisions of G.S. §§ 15A-2000, *et seq.* in connection with the first degree murder conviction. The state at first offered no evidence during this phase, choosing to rely instead upon the evidence introduced at the guilt determination phase. Defendant offered evidence of his family background, his conduct as a husband and father, and his satisfactory behavior while in prison. In rebuttal, the state offered evidence which tended to show that defendant had been found guilty of several offenses in Chatham County and that defendant had a bad reputation.

The jury found beyond a reasonable doubt the presence of the aggravating circumstance that the capital felony of first degree murder was committed while the defendant was engaged in the commission of or the attempt to commit the crime of rape. The jury also determined that such mitigating circumstances as it found to exist[2] were insufficient to outweigh the aggravating circumstance and that the aggravating circumstance was sufficiently substantial to call for imposition of the death penalty. It recommended that the death penalty be imposed; the court's judgment imposing the death sentence was accordingly entered.

## II.

**[1, 2]**   Defendant initially contends the trial court erred in denying his motion for a bill of particulars by which he sought to have the state declare upon which theory it intended to rely in making out a case of first degree murder: felony murder or premeditation and deliberation. Defendant again raised the issue at the close of all the evidence in the guilt phase of trial by moving that the state be required to elect which of the two theories would be submitted to the jury. Judge Fountain likewise denied this motion. There was no error in these rulings.

A motion for a bill of particulars is addressed to the sound discretion of the trial court. *E.g., State v. McLaughlin,* 286 N.C. 597,

---

[2] The jury found two mitigating circumstances: (1) defendant had no significant history of prior criminal activity and (2) another unnamed circumstance which the jury deemed to have mitigating value. The jury did not find defendant's age at the time of the commission of the crimes to be a mitigating circumstance.

State v. Silhan

213 S.E. 2d 238 (1975), *death sentence vacated*, 428 U.S. 903 (1976); *State v. Cameron*, 283 N.C. 191, 195 S.E. 2d 481 (1973); *State v. Spence*, 271 N.C. 23, 155 S.E. 2d 802 (1967), *death sentence vacated*, 392 U.S. 649, *on remand*, 274 N.C. 536, 164 S.E. 2d 593 (1968). In *McLaughlin*, we found no error in the trial court's denial of a bill of particulars which, as here, sought to require the state to declare prior to trial whether it would prosecute a first degree murder indictment drawn under G.S. 15-144 on a theory of premeditation and deliberation or felony murder. We there concluded that the murder indictment and a separate indictment charging the accompanying felony, joined for trial, set out sufficient factual information to enable defendant to understand the basis of the state's cases against him. So it is here. Furthermore it is well settled that the state is not generally required to elect between legal theories in a murder prosecution prior to trial. *State v. Swift*, 290 N.C. 383, 226 S.E. 2d 652 (1976). Where the factual basis for the prosecution is sufficiently pleaded, defendant must be prepared to defend against any and all legal theories which these facts may support. *State v. Boyd*, 287 N.C. 131, 214 S.E. 2d 14 (1975). A bill of particulars is normally designed to require the state to reveal "items of *factual* information desired by the defendant which pertain to the charge and which are not recited in the pleading, and must allege that the defendant cannot adequately prepare or conduct his defense without such information." G.S. § 15A-925(b). (Emphasis supplied.) Nor was it error to deny defendant's motion that the state elect at the close of the evidence which theory of first degree murder would be submitted to the jury when the evidence was sufficient to establish a *prima facie* case as to both theories, felony murder, as well as murder with premeditation and deliberation. *State v. Boyd, supra. See also State v. Swift, supra.* Here the state's evidence was sufficient to establish a *prima facie* case as to felony murder, *see e.g., State v. Crawford*, 260 N.C. 548, 133 S.E. 2d 232 (1963), as well as to murder upon premeditation and deliberation. *See e.g., State v. Davis*, 289 N.C. 500, 223 S.E. 2d 296, *death sentence vacated*, 429 U.S. 809 (1976). Since the state established a *prima facie* case as to each theory, it became the responsibility of the jury to weigh the evidence to see if it warranted a finding that defendant was guilty of murder in the first degree upon either or both theories.

[3] Defendant further contends the trial court erred in denying his motion to suppress evidence obtained from his van pursuant to a search warrant. Defendant claims the affidavit offered in support

of the application for the warrant failed sufficiently to allege the underlying facts and circumstances upon which a finding of probable cause could be based. This claim is untenable. The affidavit in question reads as follows:

"On 13 September 1977, Mary Jo Nancy Coats [sic], W/F, 14, and Barbara Davenport, W/F, 16, were ambushed in some woods near their home and Victim [sic] Coats [sic] was raped and stabbed to death, and Victim Davenport was stabbed and cut severely. A light blue van was seen parked at the crime scene. It was observed that a tire print, believed to be from the right rear wheel of the vehicle, was in the mud at the crime scene. A cast and photographs was [sic] made of this print. On 20 September 1977, Stephen Karl Silhan was arrested with a warrant charging him with the crime. At the time of his arrest, the defendant was operating a 1976 Chevrolet Van, blue in color. The affiant prays that a search warrant be issued so that the right rear tire of the van can be seized and compared by experts with the cast and photograph made at the crime scene."

The affidavit was sufficient. Probable cause prerequisite to the issuance of a search warrant exists when there is reasonable ground to believe that the proposed search will reveal the presence of objects which will aid in the apprehension or conviction of an offender. *State v. Edwards*, 286 N.C. 162, 209 S.E. 2d 758 (1974); *State v. Campbell*, 282 N.C. 125, 191 S.E. 2d 752 (1972); *see generally* M. Crowell, Search Warrants in North Carolina (1976). Probable cause cannot be established by affidavits which are purely conclusory in nature. *State v. Campbell, supra.* The affidavit must set forth enough of the underlying facts and circumstances so that the magistrate can perform his detached judicial function as a check upon intrusions by law enforcement officials into the privacy of individuals. *E.g., Aguilar v. Texas*, 378 U.S. 108, 12 L. Ed. 2d 723, 84 S.Ct. 1509 (1964); *State v. Campbell, supra; see generally* J. Cook, Constitutional Rights of the Accused: Pretrial Rights § 36 (1972).

Relying on *State v. Campbell, supra*, defendant argues that the search of the blue Chevrolet van was based solely upon his arrest and that the state is attempting to bootstrap a finding of probable cause to search the van upon the probable cause which existed for his arrest. We disagree. *Campbell* is distinguishable. In *Campbell*

State v. Silhan

an affidavit offered in support of an application for a search warrant stated merely that the affiant had in his possession arrest warrants for several individuals and that all of these individuals had sold narcotics to a named agent of the State Bureau of Investigation as well as numerous college students. The affiant sought to procure a search warrant for a particular house. In no way did the affidavit tie the house in question to the possession or sale of controlled substances. By failing to implicate the house in the illegal activity under investigation the affidavit was insufficient to permit the magistrate to exercise his independent judgment in determining whether probable cause existed. It is necessary that an affidavit for a search warrant implicate the premises to be searched. *See* 1 W. LaFave, Search and Seizure, A Treatise on the Fourth Amendment § 3.7(d)(1978). In the present case the affidavit states not only that defendant was operating a blue 1976 Chevrolet van at the time of his arrest but also that a van of the same color was observed at the crime scene. Thus the van was linked not only to defendant, who according to the affidavit had been arrested presumably on probable cause, but also to criminal activity which was then under investigation. These facts taken together are sufficient to enable the magistrate to make a determination that probable cause prerequisite to the issuance of the search warrant existed.

### III.

Defendant brings forward several assignments of error which challenge the jury which was impaneled and the manner in which it was selected. These assignments are without merit.

[4] On 17 November 1978 defendant moved that the district attorney be prohibited from inquiring about potential jurors' attitudes toward capital punishment and from excusing prior to the sentencing phase any jurors who said unequivocally that they could not impose the death penalty. Defendant argues that denial of this motion denied him a fair trial before a representative cross-section of the community in violation of the Sixth Amendment. Defendant, relying on several empirical studies,[3] also argues that death-

---

[3] H. Zeisel, Some Data on Juror Attitudes Toward Capital Punishment, Center for Studies in Criminal Justice, University of Chicago Law School (1968); Bronson, *On the Conviction Proneness and Representativeness of the Death-Qualified Jury: An*

qualified juries are "prosecution-prone" in that they are more likely to ignore the presumption of innocence and accept without close scrutiny the version of the facts put forward by the state. Thus he also claims a Fourteenth Amendment Due Process violation in the jury selection process. This argument was considered and rejected by a majority of this Court in *State v. Avery*, 299 N.C. 126, 261 S.E. 2d 803 (1980).

**[5]**  Defendant assigns as error the trial court's denial of his challenges for cause of potential jurors Enzor and Livingston. After Judge Fountain denied these challenges defendant peremptorily challenged both prospective jurors and they were excused. Thereafter defendant sought to challenge peremptorily prospective juror Arp. At this time defendant had already exhausted the fourteen peremptory challenges allowed to him by G.S. § 15A-1217, and Judge Fountain properly denied the fifteenth challenge directed to juror Arp. Defendant argues that his challenges for cause of jurors Enzor and Livingston were improperly denied and Judge Fountain ought to have cured the error by allowing him an additional peremptory challenge.

Assuming *arguendo* that it was error for Judge Fountain to deny defendant's challenges for cause to jurors Enzor and Livingston, defendant may not complain on appeal because of his failure to comply with G.S. § 15A-1214(h) and (i). This section provides that:

> "(h) In order for a defendant to seek reversal of the case on appeal on the ground that the judge refused to allow a challenge made for cause, *he must have:*
>
> (1) Exhausted the peremptory challenges available to him;
> (2) *Renewed his challenge as provided in subsection (i) of this section; and*
> (3) *Had his renewal motion denied as to the juror in*

*Empirical Study of Colorado Veniremen*, 42 Colo. L. Rev. 1 (1970); Goldberg, *Towards Expansion of WITHERSPOON: Scruples, Jury Bias and the Use of Psychological Data to Raise Presumptions in the Law*, 5 Harv. Civ. Lib. L. Rev. 53 (1970); Jurow, *New Data on the Effect of a Death-Qualified Jury on the Guilt Determination Process*, 84 Harv. L. Rev. 529 (1971); Oberer, *Does Disqualification of Jurors for Scruples Against Capital Punishment Constitute Denial of Fair Trial on the Issue of Guilt?* 39 Tex. L. Rev. 545 (1961); Rokeach and McLellan, *Dogmatism and the Death Penalty: A Reinterpretation of the Duquesne Data*, 8 Duq. L. Rev. 125 (1969); White, *The Constitutional Invalidity of Convictions Imposed by Death-Qualified Juries*, 58 Cornell L. Rev. 1176 (1973).

State v. Silhan

*question.*

(i) A party who has exhausted his peremptory challenges may move orally or in writing to renew a challenge for cause previously denied if the party either:

(1) Had peremptorily challenged the juror; or

(2) States in the motion that he would have challenged that juror peremptorily had his challenges not been exhausted.

The judge may reconsider his denial of the challenge for cause, reconsidering facts and arguments previously adduced or taking cognizance of additional facts and arguments presented. If upon reconsideration the judge determines that the juror should have been excused for cause, he must allow the party an additional peremptory challenge." (Emphasis supplied.)

The record shows that defendant did not renew his challenge for cause of either juror Enzor or Livingston after having exhausted his peremptory challenges. Defendant urges that by exhausting his peremptory challenges and thereafter asserting a right to challenge peremptorily an additional juror, his exception was preserved for review under *State v. Boyd, supra,* 287 N.C. 131, 214 S.E. 2d 14 (1975). General Statute § 15A-1214, however, was enacted and took effect after our decision in *Boyd.* To the extent that a constitutionally valid statute overrules or supplements the dictates of one of our cases the statute is, of course, controlling. Defendant's argument must, therefore, be rejected.[4]

Defendant next argues that certain jurors were excused in violation of the principle announced in *Witherspoon v. Illinois,* 391 U.S. 510 (1968) and that Judge Fountain erred in instructing the panel of prospective jurors prior to the jury selection as follows:

"Ladies and Gentlemen, the State in this case is seeking the death penalty of the charge of murder in the first degree. I say that to you so that I can make a brief explanation of how that is done. The Jury in the case will have to decide only the question of guilt or innocence.

---

[1] Our analysis of this assignment of error ought not to be taken to mean that our traditional close scrutiny on capital cases is no longer viable. *See, e.g., State v. Knight,* 248 N.C. 384, 103 S.E.2d 452 (1958). In the present case, the mandate of the statute has foreclosed our review of this assignment.

That is all. Of course if the defendant is found not guilty that is the end of it. If he is found guilty of murder in the first degree, then a Jury, and in all probability the same Jury, would hear such additional evidence as the State or Defendant wishes to offer on the question of punishment. At that time I would instruct the Jury what to consider in determining whether the death penalty should or should not be imposed. I make that explanation to you so that you will know that in the trial it is on the merits on a question of guilt or innocence. *You don't have to concern yourselves — or rather you don't have to make the ultimate decision of whether the Defendant should be executed or should not be executed.* " (Emphasis supplied.)

Defendant complains of the italicized portion of the instruction. He argues that the death sentence cannot be validly imposed by jurors so selected or instructed. Since we are vacating the death sentence and remanding for a new sentencing hearing before a new jury, we need not address these arguments.

## IV.

**[6]** Defendant contends that the trial court erred in denying his motion to examine the files of the district attorney for exculpatory evidence after it came to light at trial that the results of tests which were exculpatory had not been disclosed to defendant.

The district attorney complied with a request from defense counsel for voluntary discovery. During the cross-examination of Ms. Debbie Becher, a crime scene technician with the City-County Bureau of Identification in Fayetteville, defendant became aware apparently for the first time of a report from the Federal Bureau of Investigation which summarized the results of an analysis of finger-prints taken from the scene of the assaults. None of the prints could be identified as being those of defendant. After Ms. Becher was excused, defendant moved to inspect for additional exculpatory evidence all files in the district attorney's possession which relate to the charges being tried, or in lieu thereof, to have these files surrendered to the court "for appellate purposes." Although Judge Fountain denied these motions he ordered the district attorney to reveal to defendant any exculpatory evidence of which he had knowledge. Judge Fountain also offered to give defendant as much of a recess as he needed to deal adequately with the report. Defendant declined

State v. Silhan

the offer. Judge Fountain noted that defendant had gotten the benefit of the report during his cross-examination of Ms. Becher. The district attorney disavowed any prior knowledge of the report.

We conclude Judge Fountain's rulings were altogether correct. His offer to grant defendant a recess comports specifically with the provisions of G.S. § 15A-910(2), and his order that the district attorney produce any known exculpatory evidence reinforced the district attorney's already existing duty under *Brady v. Maryland*, 323 U.S. 83, 10 L. Ed. 2d 215, 83 S.Ct. 1194 (1963). The actions of Judge Fountain afforded defendant a full opportunity to overcome any prejudice which may have been caused by the earlier nondisclosure. Defendant was not entitled to an order permitting a *carte blanche* inspection of the district attorney's files. *State v. Tatum*, 291 N.C. 73, 229 S.E. 2d 562 (1976); *State v. Davis* 282 N.C. 107, 191 S.E. 2d 664 (1972). Finally defendant seems, in fact, not to have been prejudiced by the earlier nondisclosure.

[7]   Defendant argues that the trial court abused its discretion by instructing the district attorney to recall Mr. Davenport, father of Barbara Davenport, after he had been excused without having been cross-examined. On direct examination Mr. Davenport testified to prior identifications and descriptions by his daughter of her assailant. He stated that she was unable to talk for days immediately following the assaults but that she communicated with him by writing on a pad. After her surgery, Mr. Davenport asked her to write a complete description of what had happened. Ms. Davenport's response included a description of her attacker. Mr. Davenport stated that he did not have the written responses with him at that time. There being no cross-examination, the witness was excused. Judge Fountain called the district attorney to the bench. After the bench conference, the state over objection recalled Mr. Davenport, who then testified that the notes prepared by his daughter had been collected and turned over to the authorities. He did not then know where they were. Defendant argues that the recall of the witness after a bench conference amounted to a prejudicial expression of opinion by the presiding judge in violation of G.S. § 15A-1222.

There is no merit to this argument. Whatever transpired at the bench conference does not appear in the record. Certainly the jury did not hear it. Presumably Judge Fountain was trying to ascertain the whereabouts of Barbara Davenport's written notes, which would have been the best evidence of what she had told her

father. The notes conceivably could have benefitted defendant. Had they been available to the witness, some question could have been raised concerning the admissibility of his testimony about what his daughter had told him under the rule that "*a writing is the best evidence of its own contents*, and which in general requires a party to produce the writing itself, unless its non-production is excused . . . ." 2 Stansbury's North Carolina Evidence § 190 (Brandis rev. 1973). (Emphasis supplied.) In this inquiry Judge Fountain again acted quite properly. A trial judge is more than an umpire. He has a duty to see that the trial is conducted fairly for both sides and to eliminate error if he can including that engendered by the inadvertence of counsel for the state or the defendant. *State v. Greene*, 285 N.C. 482, 206 S.E. 2d 229 (1974); *State v. Colson*, 274 N.C. 295, 163 S.E. 2d 376 (1968), *cert. denied*, 393 U.S. 1087 (1969).

Defendant next contends the trial court erred in allowing Mr. Layton, an expert witness for the state, to testify to an opinion which was inconclusive and speculative in nature. Mr. Layton was a special agent with the State Bureau of Investigation. A plaster cast had been made on a roadside near the crime scene. This cast was compared with a tire taken from the right rear wheel of defendant's van. Defendant moved *in limine* to prohibit the state from soliciting Mr. Layton's opinion as to whether the tire taken from defendant's van could have made the impression preserved by the cast. On *voir dire*, Mr. Layton testified that he could not state conclusively that defendant's tire made the impression, but that he would say that defendant's tire *could* have made the impression. Over objection he testified to the jury that defendant's tire in his opinion could have made the impression preserved by the cast. Defendant argues that no proper foundation for this testimony was laid and, further, that since Mr. Layton's opinion was not conclusive, it was inadmissible. He relies first on *Perfecting Service Co. v. Product Development and Sales Co.*, 259 N.C. 400, 131 S.E. 2d 9 (1963).

Defendant's reliance on this case is misplaced. If the opinion of an expert is based upon obviously inadequate data, the trial judge may properly refuse to allow it to go to the jury for its consideration. *Id.* at 411, 131 S.E. 2d at 18; *see also Bryant v. Russell*, 266 N.C. 629, 146 S.E. 2d 813 (1966); *Schafer v. Southern Ry. Co.*, 266 N.C. 285, 145 S.E. 2d 887 (1966); *see generally* 1 Stansbury's North Carolina Evidence § 136 (Brandis rev. 1973). In *Perfecting Service Co.* the relevant issue was the tensile strength of metal in a mechanical

device after the design had been modified. Expert testimony as to the insufficiency of the metal's tensile strength was properly excluded because the record failed to disclose whether the tests which formed the basis of the expert testimony had been performed before or after the design had been modified. Here the issue is not the manner or timing of tests upon which the expert opinion is based. Instead, the issue is whether the opinion of Mr. Layton is incompetent because of the absence of a proper foundation or his inability to be conclusive.

[8] Evidence of tire tracks is without probative force unless from the evidentiary circumstances the jury can reasonably infer: (1) the tracks were found at or near the scene of the crime, (2) they were made at the time of the commission of the crime, and (3) they correspond to tires on a motor vehicle owned or operated by defendant. *See, e.g., State v. Atkinson,* 298 N.C. 673, 259 S.E. 2d 858 (1979); *State v. Pinyatello,* 272 N.C. 312, 158 S.E. 2d 596 (1968); *State v. Bass,* 253 N.C. 318, 116 S.E. 2d 772 (1960); *see generally* Annot. 23 A.L.R. 2d 112 (1952). Upon proper foundation being laid, evidence of tire tracks is generally admissible. *State v. Monk,* 291 N.C. 37, 229 S.E. 2d 163 (1976); *State v. Willis,* 281 N.C. 558, 189 S.E. 2d 190 (1972). Through the testimony of Mr. Layton and that of other witnesses, the state introduced evidence which tended to show: The plaster cast in question had been made along the side of the road near the place of the assaults by a technician employed by the City-County Bureau of Investigation on 14 September 1977; a blue Chevrolet van had been seen on the side of the road at or near the time of the assaults; defendant owned a van similar to the one seen. The tire tracks were such that defendant's van could have made them. This was an adequate foundation.

[9] That Mr. Layton could not positively conclude that the tire print had been made by defendant's vehicle does not make his opinion incompetent. Tire track identification is a proper subject for expert testimony. *See generally* 1 Stansbury's North Carolina Evidence § 134 (Brandis rev. 1973). The witness' inability to make a positive identification goes to the weight of his testimony; it does not render it incompetent. *State v. Patterson,* 284 N.C. 190, 200 S.E. 2d 16 (1973); *State v. Robinson,* 283 N.C. 71, 194 S.E. 2d 811 (1973); *see generally* 1 Stansbury's North Carolina Evidence § 129 (Brandis rev. 1973); 3 C. Torcia, Wharton's Criminal Evidence § 610 (13th ed. 1973). There was no error in its admission.

Defendant next contends the trial court erred by allowing Ms. Frazier, sister of Barbara Davenport, to be recalled to the witness stand to testify as to her identification of defendant's van.

This contention is without merit. When she was first called to the stand, Ms. Frazier testified that on the afternoon of the crimes she had been in the Manchester Road neighborhood adjoining Pope Air Force Base. Ten minutes after her sister and Nancy Coates went to a nearby convenience store she too left the house and began walking to the store. As she traveled along the highway she observed a light blue Chevrolet van parked along the side of the road. Ms. Frazier was subsequently recalled by the state. On recall, she testified that shortly before defendant's trial began, she went to the Cumberland County Law Enforcement Center in Fayetteville pursuant to a request from the Cumberland County Sheriff's Department. She was driven by a deputy sheriff to a parking lot where she observed several vans. There she spontaneously identified one of the vans as being the one which she had seen parked along Manchester Road on 13 September 1977. Other witnesses established that the van selected by Ms. Frazier was the defendant's van. Defendant argues the trial court erred in receiving this evidence.

In raising on appeal the propriety of Ms. Frazier's testimony, defendant makes three independent arguments: (1) the identification procedure was unduly suggestive; (2) the procedure failed to comply with established procedures governing the admission into evidence of "experiments"; and (3) the testimony ought to have been excluded because the district attorney failed to inform defense counsel of the "experiment" and its results as required by G.S. § 15A-903(e).

[10] As to the first argument, we conclude the procedure employed was not unduly suggestive. Ms. Frazier testified she had seen the van in broad daylight without any obstruction to her view. Nothing suggests that defendant's van was displayed or portrayed in any manner which could reasonably be said to single it out for her special attention. In fact, the evidence shows without contradiction that defendant's van was parked in a lot with several other vans, one of which was also blue, albeit a shade darker than defendant's van. Neither the deputy sheriff with whom she rode nor any other law enforcement officer in any way directed Ms. Frazier's attention to defendant's van by conduct or speech.

[11]   We answer defendant's remaining two arguments by concluding that the van identification procedure was not an "experiment." An experiment for purposes of the law of evidence is generally a procedure "in which contested facts are artificially reproduced and the results observed." 1 Stansbury's North Carolina Evidence § 94 at 304 (Brandis rev. 1973); *compare Stone v. City of Florence*, 203 S.C. 527, 28 S.E. 2d 409 (1943). Here no contested fact was artificially reproduced. Events at the scene of the crime were not reenacted. Nor were specialized tests designed and performed. All that occurred was that a witness for the state engaged in a procedure by which she identified defendant's van as being the vehicle which she had seen on the afternoon of 13 September 1977. This was no more an "experiment" than pre-trial lineup identification procedures, or pre-trial photographic identification procedures are "experiments." This was simply a pre-trial van identification procedure. None of these kinds of identification procedures are "experiments" as that term is used in the law of evidence nor are they "tests, measurements, or experiments" as these terms are used in the discovery statute, G.S. § 15A-903(e).

[12]   Defendant next contends the trial court erred by receiving into evidence a photograph of defendant which had been taken one month before the two women were assaulted. This error, defendant argues, was compounded by the trial judge when he allowed a witness to testify as to the circumstances surrounding the photograph. During her direct examination, Ms. Davenport testified that her assailant wore a "jungle fatigue cap" and eyeglasses with black frames and dark lenses. Thereafter Mr. Carpenter, a squad leader in defendant's Army platoon at Fort Bragg, North Carolina, testified that he had observed defendant on a trip the unit had taken down the Cape Fear River in August, 1977. Defendant was wearing a patrol cap and sunglasses. Mr. Carpenter had photographed the unit including defendant. The photograph was admitted into evidence to illustrate Mr. Carpenter's testimony regarding the type of cap and sunglasses defendant was wearing on that occasion. There was no error in so admitting the photograph.

Defendant argues the photograph was irrelevant. Evidence is relevant if it has any logical tendency, however slight, to prove a fact in issue. *State v. Banks*, 295 N.C. 399, 245 S.E. 2d 743 (1978). The photograph and the accompanying testimony of Mr. Carpenter met this standard. The testimony tended to show that within at least

a month of the attack defendant wore a cap and eyeglasses similar to that which Ms. Davenport contends were worn by the man who attacked her. This testimony was relevant in that it was one circumstance among others tending to identify defendant as her assailant. The photograph was properly admitted as tending to illustrate Mr. Carpenter's testimony.

**[13]** Defendant argues further that the photograph should not have been admitted because the state failed to produce it prior to trial pursuant to his request for voluntary production. If this photograph was in the state's "possession, custody, or control" before trial, "material to the preparation of the defense," and "intended for use by the State as evidence," the district attorney should have produced it prior to trial upon defendant's request. G.S. § 15A-903(d). Defendant has not shown that the photograph was in the state's "possession, custody, or control" before trial. Even if it was, exlusion of it at trial is not the only appropriate sanction for the state's failure to produce it. G.S. § 15A-910. Defendant never requested that the photograph not be admitted on the grounds of the state's failure to comport with our discovery rules nor did he ask for any other sanction permitted by the statute. The admission of the photograph, consequently, was not error. *See State v. Jones*, 295 N.C. 345, 245 S.E. 2d 711 (1978); *State v. Braxton*, 294 N.C. 446, 242 S.E. 2d 769 (1978); *State v. Thomas*, 291 N.C. 687, 231 S.E. 2d 585 (1977).

**[14]** Defendant next asserts the trial court erred in allowing Sergeant Hartman to testify that while their unit was on maneuvers at Camp A. P. Hill, Virginia, on 11 September 1977, he saw defendant in possession of a bayonet with a blade approximately one foot long and one inch wide. Sergeant Hartman was then allowed over objection to identify State's Exhibit Fifty-eight as being a knife similar in blade length and width to the weapon which he had seen in defendant's possession. Defendant argues that the exhibit was not connected to commission of the crimes for which he was tried.

There was no prejudicial error. Shortly before Sergeant Hartman testified, Sergeant Oscott, defendant's platoon sergeant on 11 September 1977, testified that during these maneuvers he had seen defendant with an old bayonet whose blade was approximately twelve to fourteen inches long and one inch wide. The witness further testified that State's Exhibit Fifty-eight was similar to the weapon which he had seen in defendant's possession in Virginia.

Defendant lodged no objection to Sergeant Oscott's testimony. It is well-established that the admission of testimony or other evidence over objection is harmless when testimony or other evidence of the same import has previously been admitted without objection. *E.g.*, *State v. Chapman*, 294 N.C. 407, 241 S.E. 2d 667 (1978); *see generally* 1 Stansbury's North Carolina Evidence § 30 (Brandis Rev. 1973).

[15]   Defendant next argues the trial judge erred in permitting the state to introduce written statements of Ms. Davenport which had not been identified by her during her direct examination and which had not been disclosed to defense counsel. Detective Byrd testified for the state. At trial Detective Byrd was employed by the Fayetteville Police Department; but at the time of the assault he was a homicide investigator with the Cumberland County Sheriff's Department. Detective Byrd testified that on 13 September 1977 he talked with Ms. Davenport about the assaults. Though she was unable to talk, she was able to communicate through handwritten notes. On 20 September 1977 Detective Byrd presented Ms. Davenport with a series of written questions which she answered in her own handwriting on a separate sheet of paper. These answers constituted State's Exhibits Number Fifty-nine and Sixty which were admitted into evidence and read to the jury over objection. Defendant argues the evidence was inadmissible hearsay and that its admission violates his Sixth Amendment right of confrontation. We disagree.

At trial, Ms. Davenport gave a detailed account of the events of 13 September 1977 as well as a description of her assailant. She further testified to her written communications with her father and law enforcement officers concerning the attacks and her description of her assailant. The written statements embodied in the answers which she gave to the officer's written questions were not hearsay. When evidence of a prior consistent statement of a testifying witness is received, it is not hearsay because it is received to prove only that the statement was made, not to prove its truth. *See, e.g.*, *State v. Medley*, 295 N.C. 75, 243 S.E. 2d 374 (1978); *State v. Hopper*, 292 N.C. 580, 234 S.E. 2d 580 (1977); *see generally* 1 Stansbury's North Carolina Evidence § 141 (Brandis Rev. 1973). On cross-examination Ms. Davenport's credibility was subjected to a severe attack by defendant who sought to establish that she had made *prior inconsistent statements* concerning the incidents of 13 September 1977. The state was well justified in attempting to rehabili-

tate Ms. Davenport's credibility before the jury. *E.g.*, *State v. Steg-mann*, 286 N.C. 638, 213 S.E. 2d 262 (1975), *death sentence vacated*, 428 U.S. 902 (1976).

Nor did this procedure deny to defendant his Sixth Amendment right of confrontation. Defendant's contention apparently is that his rights were prejudiced by the introduction of these statements because he was unable to cross-examine Ms. Davenport about them. The face of the record belies this argument. After the state rested its case, Judge Fountain conferred with the district attorney and defense counsel concerning the prior written statements of Ms. Davenport. After Judge Fountain directed the district attorney to turn over to defendant any such statements, he inquired as to whether there were additional points which defendant would like to raise. At that time, the following discussion ensued:

"MRS. TALLY: Mr. Conerly has also previously testified that Barbara made notes on September 15, 1977; that Barbara wrote answers to questions on September 17, 1977, and questions and answers which, I assume, are the ones—
COURT: Aren't they the ones Mr. Byrd testified about?
MRS. TALLY: Yes, sir.
COURT: Well, you were given copies of those, were you not?
MRS. TALLY: No sir; not for cross-examination.
COURT: Well, you have cross-examined him about it.
MRS. TALLY: No, sir.
COURT: I will give you a copy —

MRS. TALLY: Your Honor, we would just ask that these statements and notes be placed in an envelope and sealed for appellate review.

COURT: I will let you have them. You can use them for whatever you can use them for—if you want to use them to cross-examine the witness, you may have them.

MRS. TALLY: That time has passed.
COURT: I will let you call the witness back and I will give you ample time to study those documents — until tomorrow, if you want — I will give you whatever time you need.
MRS. TALLY: We would simply ask that those state-

ments and notes be placed in an envelope and sealed for appellate review.

COURT: I am not going to do that. I will give them to you, if you want.

MRS. TALLY: Your Honor, I can't see any good that I can get out of them now.

COURT: Well, Mrs. Tally, so that there will be no misunderstanding, any document that you want I will direct the solicitor to give them to you. If you need additional time to study those documents, I will give you additional time. Now, if you want to talk to Mr. Williams, I will stop. *I will give you all the time that you need to study them, recall any witness the State has offered to examine them about those documents, if you wish. Just say so.* (Emphasis supplied.)

MRS. TALLY: Your Honor, I do not wish to have them.

COURT: All right. Give her copies of them. Are there any others than the ones you have already mentioned?

MRS. TALLY: I have no idea. Mr. Grannis had agreed and the Court had ordered that those things be turned over. I have no idea what he has.

COURT: Well, you are going to get them. Are they all in the handwriting of Barbara Davenport as far as you know?

MR. GRANNIS: There's Barbara Davenport's handwriting on all of them but on one of them, I believe, there is also the handwriting of her father. We have no objection to her having that either.

COURT: Okay. Now, Mrs. Tally, the questions and answers that Mr. Byrd read to the Jury, did you not have a copy of those?

MRS. TALLY: No, sir.

COURT: *Give her a copy of those and you may recall Mr. Byrd, if you wish, or any other witness you wish.* (Emphasis supplied.)

All right. If you need time for those, I will give you until tomorrow, if you need to. Would you like time to consider those documents?

MR. WILLIAMS: Your Honor, at this time we would ask to continue whatever proceedings until tomorrow. At

> this time I don't think we are going to call these witnesses back but we would like some time.
>     COURT: I will give you time to do that."

When court convened the next morning and before the jur" entered the courtroom, Judge Fountain again asked defendant if h would like to recall *any* of the state's witnesses. The offer was declined. Defendant then had the opportunity to cross-examine Ms. Davenport or any other witness concerning these statements but declined to do so. Judge Fountain's rulings not only did not deny defendant's right of confrontation, they scrupulously protected it.

**[16]** Defendant next argues the state failed to show chain of custody as to a pair of boots which had been taken from him after his arrest. Defendant does not argue that the boots are not his. Nor does he argue that they have been altered in any way. He contends, instead, that the state has failed to establish where the boots were kept and in whose custody they reposed during the period between their seizure and their introduction into evidence.

We conclude there was no need to show a chain of custody as a prerequisite to admitting the boots. Detective Byrd testified that the boots offered in evidence were those he observed taken from defendant at the Law Enforcement Center after defendant's arrest. He then noticed that the boots had a new pair of shoelaces in them. The shoelaces contained in the boots when they were offered into evidence were those which he had noticed earlier. This was sufficient identification of the boots to permit them to be offered without showing a chain of custody. *State v. Boyd,* 287 N.C. at 143, 214 S.E. 2d at 20-21.

**[17]** At the close of the state's case, the following occurred:

> "MR. GRANNIS: Your Honor, at this time if we have not offered all the exhibits into evidence, we would at this time offer all that had not heretofore been admitted into evidence.
>     MRS. TALLY: We would OBJECT.
>     COURT: Which ones do you specifically object to?
>     MR. WILLIAMS: If he says he is going to introduce all of them, we are going to OBJECT to all of them.
>     COURT: Then I'm going to OVERRULE your objection. Let them be admitted."

Defendant now asserts that he was entitled at that stage of the trial to have each exhibit individually introduced so that he could interpose objections to inadmissible items. He now says the procedure deprived him of due process of law.

We disagree. There is no showing in the record that the state was attempting to or did surreptitiously slip into evidence some new item to which defendant had not had an opportunity to object. So far as the record reveals defendant did, in fact, have opportunity to interpose objections to every item of physical or documentary evidence shown to the jury during the trial. It is obvious that the district attorney was seeking to insure that all such items and only such items were formally introduced into evidence. Defendant was given opportunity to object specifically to any item. He declined to do so. We find no error in this procedure.

[18]　Defendant next argues the trial court erred by not allowing him to "make a record" as to prior written statements of Ms. Davenport that identified him as her assailant and described his characteristics. These statements are embodied in handwritten notes taken during a questioning session between Ms. Davenport and law enforcement officers on 14 September 1977 and answers which she gave to Detective Byrd on 20 September 1977. At the close of the state's evidence defendant moved to have this material placed in an envelope and sealed for purposes of appellate review. Judge Fountain denied this motion. Defendant asserts this action violated his right to due process of law and constitutes reversible error. We disagree.

When a defendant seeks to compel disclosure by the state of evidence material to his defense and embodied in the statement of a witness for the prosecution, the requirements of due process are satisfied by the order of the trial judge directing that an *in camera* hearing be held on the attempt to compel disclosure. *State v. Hardy*, 293 N.C. 105, 235 S.E. 2d 828 (1977). At the close of the hearing, the trial judge is obligated to make findings of fact and conclusions of law. If the trial judge *denies* a defendant's motion in this regard, it is incumbent upon him to order that the sealed statement be placed in the record for appellate review. *State v. Hardy, supra*, 293 N.C. at 128, 235 S.E. 2d at 842.

Judge Fountain did not *deny* defendant's motion to compel discovery; he *allowed* it. He directed the district attorney at trial to

give defendant the statements in question; offered to allow defendant to recall any witness whom he wished to examine concerning the documents; and offered to grant a recess so that defendant would have opportunity to consider the materials. There was no error in his rulings regarding these statements. They were quite favorable to defendant.

At the close of the state's evidence, defendant moved for judgment of dismissal. Defendant concedes the evidence adduced by the state was sufficient to enable the state to go to the jury on the issue of defendant's guilt. Nevertheless he asks this Court to review the sufficiency of the state's evidence in light of the seriousness of the offenses with which he is charged and the penalty pronounced upon him. This we have done. Our examination impels our conclusion that the evidence introduced by the state fully warranted submission of the question of defendant's guilt to the jury for its consideration.

## V.

[19]   Defendant brings forward a number of assignments of error challenging the accuracy and sufficiency of Judge Fountain's jury instructions. We conclude there was no error in these instructions.

Defendant argues that Judge Fountain erred by not giving defendant's requested jury instruction concerning the identification of defendant as the perpetrator of the crime. The essence of the requested instruction is that the jury must be satisfied beyond a reasonable doubt that defendant was the perpetrator of the crime and that in testing the credibility of a witness' identification the jury ought to weigh several factors in the balance: the capacity of the witness to make an observation through the senses, the opportunity of the witness to make such an observation, and such details as the lighting at the scene of the crime, the mental and physical condition of the witness, the length of time of the observation, the degree of attention being paid by the witness, as well as any other factors which might have aided or hindered the witness in making the observation. Judge Fountain responded to the request by saying that he would, in substance, give the requested instruction. *See, e.g., State v. Monk*, 291 N.C. 37, 229 S.E. 2d 163 (1976). He stated:

> "I instruct you that it is your duty to consider the testimony of each of the witnesses. Determine the means and

State v. Silhan

opportunity of each of the witnesses to know the things
about which they testify or lack of means and opportunity
to know the things about which they testify. You shall
give to the testimony of each of the witnesses sufficient
weight and credibility as you find it deserves in order to
ascertain the truth."

He also instructed the jury on defendant's contentions as follows:

"He contends that you should not accept the identifica-
tion of him by Barbara Davenport. He contends that the
evidence offered by the State shows that she had only a
scant opportunity to observe whoever it was present and
that her description of her assailant was not the descrip-
tion of the Defendant. He contends, that is, the Defendant
contends, that she, Barbara Davenport, has on different
occasions made statements inconsistent with her testi-
mony in a material way and that you should reject her
testimony concerning any kind of identification."

These instructions taken together adequately convey the substance
of defendant's request. There was no error in failing to give defend-
ant's request in its exact form. *State v. Monk, supra.*

[20] Nor did Judge Fountain err by denying defendant's request
that evidence brought out on cross-examination of state's witnesses
be included in the court's summary of the evidence. In response to
this request, Judge Fountain stated:

"Well, Mrs. Tally, I do not charge my juries that way. I do
not take the witnesses and tell the jury what the witness
has said, either on direct or cross. I will briefly summar-
ize the evidence only sufficiently to charge the jury on the
law. It is not my intention to attempt to quote what any
witness said about anything."

This response was altogether a correct statement of a trial
judge's duty regarding his summary of the evidence. "In instruct-
ing the jury, the judge must declare and explain the law arising on
the evidence. *He is not required to state the evidence except to the
extent necessary to explain the application of the law to the evidence.*
He must not express an opinion whether a fact has been proved."
G.S. § 15A-1232. (Emphasis supplied.) His instructions comported
with this response. Judge Fountain briefly arrayed the evidence for

the state, and gave the state's contentions. He then gave a full statement of defendant's contentions concerning this evidence, its failure to prove his guilt beyond a reasonable doubt, its contradictions, its weaknesses, and the portions of it which were favorable to his defense.

Prejudicial error is committed when a trial judge gives an exhaustive and detailed array of the state's contentions and evidence but deals with the contentions and evidence of the defendant in only a brief and summary fashion. *State v. King*, 256 N.C. 236, 123 S.E. 2d 486 (1962); *State v. Kluckhohn*, 243 N.C. 306, 90 S.E. 2d 768 (1956). But a trial judge is not required to consume an equal amount of time in stating the contentions and evidence of each party to a case. *See State v. Doss*, 279 N.C. 413, 183 S.E. 2d 671 (1971), *death sentence vacated*, 408 U.S. 939 (1972). Judge Fountain's instructions were carefully balanced both for the state and defendant. There was no error in this aspect of the instructions.

**[21]**   Defendant next contends that the trial court erred in stating his contentions to the jury. The essence of defendant's argument is that it is a "dangerous practice" to state the contentions of the parties and that the trial court ought to leave discussion of the parties' contentions to their respective oral arguments. Defendant offers no authority in support of this position. The rule with us is that it is not error for the trial judge to state the contentions of the parties provided that the contentions of each litigant are stated fairly and accurately. *See State v. Thomas*, 284 N.C. 212, 200 S.E. 2d 3 (1973). There was no error in this aspect of the instructions.

Defendant further argues that Judge Fountain misstated one of his contentions when he said:

> "[Defendant] further contends that the evidence favorable to him tends to show that his statement that he had been in Virginia at the military camp was consistent with the truth; that it was just a way of saying that he had nothing to do with and was not present at the time of the alleged crime."

Defendant argues that Judge Fountain by this statement gave a contention of defendant that he was in Virginia at the time of the crimes whereas defendant did not so contend. We do not read the statement this way. It is rather a statement of defendant's conten-

tion that he was not the perpetrator because he was somewhere else at the time of the crime. In addition Judge Fountain offers a plausible explanation favorable to defendant for his pre-trial statement that he was in Virginia when the crimes were committed—a statement which some of the state's evidence tended to refute—in the event the jury might believe that such a statement was made. Furthermore misstatements of a party's contentions ordinarily must be called to the trial court's attention in order to give opportunity for correction before they can be considered on appeal. *State v. Abernathy*, 295 N.C. 147, 244 S.E. 2d 373 (1978).

Defendant next argues that Judge Fountain inadequately defined the crimes of first degree rape and first degree murder. Suffice it to say that we have carefully examined these portions of the jury instructions and find them to be complete and accurate statements of the law. Nothing would be served by our setting out the instructions and demonstrating their accuracy.

[22] After Judge Fountain had completed his summary of the evidence, and during his instruction on the elements of the various degrees of rape, he stated:

> "Of course, the fact that a person has sexual intercourse — if in fact such an act was committed by or upon Nancy Coates — in and of itself does not mean that that person has been a victim of rape. However, the state has offered evidence which I failed to mention. I do so now simply because I overlooked it in the summation I made earlier; that the vagina of Nancy Coates was in some way injured. I don't recall the exact testimony in that regard — or it was damaged in some way — and that semen was present, which I think I did mention."

Defendant argues that this insertion of additional evidence at this point, albeit evidence which had been presented, constitutes error because it gave undue emphasis to that evidence. By so doing, defendant says that Judge Fountain expressed an opinion prejudicial to defendant in violation of G.S. §15A-1232.

We cannot agree. Even if placement of this bit of evidence unduly emphasized it, we are satisfied no prejudice to defendant resulted. That Nancy Coates was raped is a fact beyond dispute in

this case. She was assaulted with a knife and her hands bound behind her. She was heard by her companion to protest the action of her assailant. She was found nude from the waist down. An autopsy revealed two prominent stab wounds in her chest and back; scratches over her thighs and legs; lacerations to and live, mobile sperm in her vagina. The defense did not rest on consent. The defense was that defendant was not the perpetrator. Had the battleground in this case been whether Ms. Coates was raped or consented to intercourse this instruction would have to be more closely scrutinized. As the case stands the instruction, even if error, could not have been prejudicial.

**[23]**   There was no error in Judge Fountain's instructions to the jury concerning the age of defendant. Judge Fountain stated:

> "As far as I recall, there is no evidence of the defendant's age in this case. However, it is proper for the jury to look at the defendant, consider whether he appears to be more than sixteen years of age or not; consider the evidence as to whether he was or was not operating a vehicle; as to whether he was or was not married; any other evidence in the case that you consider relevant in determining whether he is more than sixteen years of age."

An essential element of the crime of first degree rape is that defendant must be sixteen years of age or older. G.S. §14-21; *State v. Goss, supra; State v. Perry, supra.* A jury may look upon a defendant to determine his age, *State v. Evans,* 298 N.C. 263, 258 S.E. 2d 354 (1979), and may consider other circumstances, such as those mentioned by Judge Fountain, which bear upon a person's age in determining this issue.

**[24]**   Defendant next complains of this instruction on circumstantial evidence:

> "The facts, relations, connections and combinations should be natural, clear, reasonable and satisfactory. When such evidence is relied upon to convict, it should be clear, convincing and conclusive in all its combinations and should exclude all reasonable doubt as to guilt.
>
>     . . . .

> After considering the evidence in this way and deter-
> mining the circumstances, if any, which are estab-
> lished beyond a reasonable doubt, the next thing for
> the jury to determine is do these circumstances include
> every reasonable conclusion except that of guilt. If so,
> the evidence is sufficient to convict. If not, it is not."

Judge Fountain inadvertently used the word "include" rather than "exclude" in the second paragraph. In all other respects, it is correct. *Compare State v. Sledge,* 297 N.C. 277, 254 S.E. 2d 579 (1979); *State v. Hood,* 294 N.C. 30, 239 S.E. 2d 802 (1978). Viewing the instruction as a whole, *State v. Tomblin,* 276 N.C. 273, 171 S.E. 2d 901 (1970), we are satisfied the jury was not misled or confused by this *lapsus linguae.* A mere slip of the tongue which is not called to the attention of the court at the time it is made will not constitute prejudicial error when it is apparent from a contextual reading of the charge that the jury could not have been misled thereby. *State v. Goines,* 273 N.C. 509, 160 S.E. 2d 469 (1968).

[25]  At the close of Judge Fountain's instructions, defendant renewed his motion that the jury be charged on the evidence tending to identify him as the perpetrator. Judge Fountain then stated to the jury:

> "Members of the Jury, inasmuch as you have not
> begun your deliberations, the Defendant's counsel has
> requested that I instruct you further about certain
> matters, each of which I thought I had covered but, in
> an abundance of precaution, I will comment about it
> further.
>
> As I said to you, and I say again so that it will not be
> misunderstood, in order for the Jury to find beyond a
> reasonable doubt that the Defendant is guilty of any
> degree of any of the offenses charged or of anything
> whatever, obviously, the State must satisfy the Jury
> from the evidence and beyond a reasonable doubt that
> the Defendant was present at the place referred to in
> this testimony on the afternoon and early evening of
> September 13, 1977. If he was not present or if you
> have a reasonable doubt as to his presence, you would
> acquit him of all charges because in order to find him
> guilty, the State must prove that he was present and

that he participated in and committed the crimes charged."

We have already considered and rejected defendant's contention that Judge Fountain's earlier instructions on identification testimony were inadequate. Defendant argues here that Judge Fountain in these closing instructions prejudicially expressed an opinion adverse to defendant. The argument is feckless. Judge Fountain's statement that he had thought he had covered the matter earlier but would give additional instructions out of an abundance of caution does not constitute an expression of opinion. There was no error.

When the jury returned verdicts finding defendant guilty as charged, defendant moved to set aside the verdict as contrary to law and evidence and for a new trial for error committed. Both motions were denied. The first is addressed to the sound discretion of the trial court and is not reviewable on appeal absent a showing of an abuse of discretion. *State v. McKenna*, 289 N.C. 668, 224 S.E. 2d 537, *death sentence vacated*, 429 U.S. 912 (1976). No such abuse of discretion has been shown. We find no error in the guilt phase; therefore the second motion was properly denied.

## VI.

After the jury found defendant guilty of first degree murder, it was excused by Judge Fountain until the following day. In the jury's absence defendant renewed his motion that the state disclose whatever evidence relevant to sentencing it intended to rely on. Judge Fountain requested that the state give defendant "a statement of what aggravating circumstances" it intended to rely upon and "any written statements from any witnesses concerning" those aggravating circumstances. The following colloquy then occurred between the court and the prosecutor:

"MR. GRANNIS: That will take some time.

COURT: Do you have any written statements concerning the punishment aspect of it that has not already been given?

MR. GRANNIS: Yes, sir.

COURT: You do?

MR. GRANNIS: Yes, sir.

COURT: Let her have those and let her know what aggravating circumstances you expect to offer.

State v. Silhan

MR. GRANNIS: Those aggravating circumstances based on all the evidence.

COURT: Right, assuming you do not intend to proceed on all of them.

MR. GRANNIS: Correct.

COURT: So whichever one or more you expect to proceed on, just give her a statement to that effect.

This constitutes DEFENDANT'S EXCEPTION NO. 126.

MR. GRANNIS: Your Honor, we would intend tomorrow to proceed with regard to evidence concerning an incident where this Defendant was involved in Chatham County. I have not determined what written statements were taken from the victims that are present here in court but I do have a transcript and I can Xerox all that.

COURT: Do you need it tonight?

MRS. TALLY: I do.

MR. GRANNIS: I will go to the Clerk's Office and give her a copy. That will take a little time but I think I can have it done this afternoon.

COURT: All right."

The following day court was convened for the sentencing hearing. The state offered no evidence in chief, intending apparently to rely upon evidence presented during the guilt determination phase. Defendant offered the testimony of Jerry Wooten, a paralegal in the Public Defender's Office; Joe Pratt, a correctional sergeant with the North Carolina Department of Correction assigned to Central Prison; defendant's neighbors; and members of defendant's family. This evidence tended to show that defendant was married and the father of two children. He was a good husband and father and, according to his parents, had been a good, dutiful son. He was the third of eight children and had a normal childhood. He participated in the Boy Scouts and Little League Baseball and held a number of part-time jobs. After participating in Junior R.O.T.C. in high school, he left high school in his senior year to join the Army. Thereafter he obtained his high school equivalency certificate and attained the rank of sergeant.

The state offered rebuttal evidence from various military personnel who had known defendant in the Army. These witnesses

testified that defendant's "general character and reputation" in the Army was "bad." Judge Fountain instructed the jury that they should not consider this character testimony as "substantive evidence." He said, "It is evidence offered only for the purpose of impeaching the testimony of witnesses offered by the defendant to the effect that he was a person of good character, or a good person . . . "

On the state's cross-examination of Jerry Wooten, the Public Defender's paralegal, Wooten testified that he was aware that defendant had been tried and convicted in Chatham County of "a sexual offense," an "assault," and "crime against nature." Wooten further testified that he was not aware "until this morning" that the victims of these crimes were named Johnson. The state then offered the testimony of Mr. and Mrs. Johnny Johnson which tended to show that in September 1976 in Chatham County defendant assaulted them with a pistol, tied them, and after threatening them with death if they did not cooperate, forcibly committed a "crime against nature" against Mrs. Johnson.

Before trial defendant had moved to suppress all reference to the Johnson incidents on the ground that the case had been tried in October 1977 and was then on appeal to the North Carolina Supreme Court.[5] Judge Fountain reserved ruling on the motion. During the sentencing phase, over defendant's objection,[6] he permitted the evidence to be offered.

---

[5]This Court later found no error in defendant's Chatham County convictions for (1) the kidnapping of Mr. and Mrs. Johnson, (2) crime against nature performed upon Mrs. Johnson, and (3) assault with intent to rape Mrs. Johnson. State v. Silhan, 297 N.C. 660, 256 S.E. 2d 702 (1979).

[6]Defendant's brief makes it clear that his objections to this testimony were based on two grounds: (1) the Chatham County convictions were on direct appeal at the time of this trial, and (2) the Chatham County convictions were not obtained until after the incidents in the present case occurred. As we have already noted, no error was found by this Court in the Chatham County convictions. See n. 5, supra. Further, since the date of this trial, we have held that the state may utilize the aggravating circumstance defined by G.S. §15A-2000(e) (3), i.e., "The defendant had been previously convicted of a felony involving the use or threat of violence to the person," if the state establishes that: "(1) defendant had been convicted of a felony, that (2) the felony for which he was convicted involved the 'use or threat of violence to the person,' and that (3) the conduct upon which this conviction was based was conduct which occurred prior to the events out of which the capital felony charge arose." State v. Goodman, 298 N.C. 1, 22, 257 S.E. 2d 569, 583 (1979). (Emphasis supplied.) This point is discussed more fully later in the text.

Judge Fountain submitted one aggravating circumstance, that defined by G.S. § 15A-2000(e)(5), to the jury for its consideration: The capital felony, first degree murder, "was committed while the defendant was engaged . . . in the commission of, or the attempt to commit . . . rape . . . ." The jury found beyond a reasonable doubt the presence of this circumstance. *See*   G.S. § 15A-2000(c)(1). Judge Fountain charged the jury as to these mitigating circumstances: Defendant's lack of a history of prior criminal activity; defendant's age at the time of the crime; and any other circumstance arising from the evidence which the jury deemed to have mitigating value. *See* G.S. §§ 15A-2000(f)(1), (7) and (9). The jury found that defendant had no significant history of prior criminal activity and that there were unspecified circumstances which it deemed to have mitigating value. The jury found the age of defendant was not a mitigating factor. The jury further found beyond a reasonable doubt: (1) the aggravating circumstance was sufficiently substantial to call for the imposition of the death penalty, and (2) the mitigating circumstances were insufficient to outweigh the aggravating circumstance. *See* G.S. §§ 15A-2000(c)(2) and (3). The jury therefore recommended that defendant be sentenced to death.

Pursuant to the jury's mandate, Judge Fountain sentenced defendant to death in the murder case. Judge Fountain also sentenced defendant to life imprisonment in the first degree rape case and to a consecutive term of twenty years imprisonment in the assault case. Both terms of imprisonment were to be served upon the expiration of the sentences which had been imposed upon defendant for his criminal conduct in Chatham County. Defendant's motion to arrest judgment in the rape conviction was denied.

Defendant contends that it was error to deny his motion to arrest judgment in the rape conviction and that it was also error to permit the jury to consider this rape as an aggravating circumstance in the murder case. He asks for a new sentencing hearing because of the latter error. We agree with both contentions and order that judgment be arrested in the rape case and that a new sentencing hearing be conducted in the murder case. The reason is that the jury was permitted to return a first degree murder verdict on the theory of felony murder in which the rape constituted the underlying felony.

**[26]**   When a defendant is convicted of first degree murder pursuant to the felony murder rule, and a verdict of guilty is also returned

on the underlying felony, this latter conviction provides no basis for an additional sentence. It merges into the murder conviction, and any judgment imposed on the underlying felony must be arrested. *State v. Squire*, 292 N.C. 494, 234 S.E. 2d 563 (1977); *State v. Thompson*, 280 N.C. 202, 185 S.E. 2d 666 (1972). When, however, a defendant has been convicted of first degree murder on a theory of premeditation and deliberation and in the process commits some other felony, the other felony is not an element of the murder conviction although the other felony may be part of the same continuous transaction. Defendant may in such cases be sentenced upon both the murder conviction and the other felony conviction. *State v. Tatum*, 291 N.C. 73, 229 S.E. 2d 562 (1976). But when a jury is properly instructed upon both theories of premeditation and deliberation and felony murder, and returns a first degree murder verdict without specifying whether it relied on either or both theories, the case is treated as if the jury relied upon the felony murder theory for purposes of applying the merger rule. Judgment imposed on a conviction for the underlying felony must be arrested. *State v. McLaughlin*, 286 N.C. 597, 213 S.E. 2d 238 (1975), *death sentence vacated*, 428 U.S.903 (1976).

Here evidence in the murder case supported submission of both theories of first degree murder: premeditation and deliberation and felony murder committed during a rape. The jury did not specify that it relied on either or both theories. Therefore judgment on the rape conviction must be arrested.

**[27]** When a criminal defendant is convicted of first degree murder upon a theory of felony murder, it is error to submit the underlying felony to the jury at the punishment phase of trial as one of the aggravating circumstances defined by G.S. § 15A-2000(e)(5). *State v. Cherry*, 298 N.C. 86, 257 S.E. 2d 551 (1979). However, when the murder is committed during the commission of a felony enumerated by G.S. § 15A-2000(e)(5) and defendant is convicted of first degree murder on a theory of premeditation and deliberation, the other felony may properly be considered as an aggravating circumstance. *See State v. Cherry, supra.* Similarly, when a jury specifies that it finds a defendant guilty upon both theories and *both* are supported by the evidence, the underlying felony may properly be submitted as an aggravating circumstance. *State v. Goodman*, 298

N.C. 1, 257 S.E. 2d 569 (1979).[7]

Here, as in *McLaughlin,* both theories of first degree murder were properly submitted to the jury, but the jury did not specify the theory or theories upon which it relied. As in *McLaughlin* judgment on the underlying felony, *i.e.,* the rape, must be arrested. Likewise this underlying felony may not be considered as an aggravating circumstance in the penalty phase, because it has merged with and become a part of the murder conviction as an essential element thereof. *State v. Cherry, supra.*

The state's reliance upon *State v. Johnson, supra,* 298 N.C. 47, 257 S.E. 2d 597, is misplaced. In *Johnson* defendant pleaded guilty to first degree murder. At the sentencing hearing, the state introduced evidence that the murder was committed during the commission of or attempt to commit the crime of rape. The evidence which was adduced to provide a factual basis for defendant's guilty plea would have supported a conviction of first degree murder on a theory of premeditation and deliberation, felony murder, or both. We held that the question of the correctness of submitting the rape as an aggravating circumstance simply did not arise. We nevertheless vacated Johnson's death sentence on other grounds.

*Johnson,* as noted, involved a guilty plea, not a jury verdict. A defendant, nothing else appearing, pleads guilty to a charge contained in a bill of indictment not to a particular legal theory by which that charge may be proved. His plea waives his right to put the state to its proof. It obviates the necessity for the state's invocation of some particular legal theory upon which to convict defendant. The question of which theory, if there is more than one available, upon which defendant might be guilty does not arise. His plea of guilty means, nothing else appearing, that he is guilty upon any and all theories available to the state. The effect, then, of a guilty plea to first degree murder, the factual basis for which demonstrates that there is more than one theory to support it, is the same as a jury verdict of guilt which specifies that it is on all theories available — the situation which existed in *State v. Goodman, supra,*

---

[7] Whenever a first degree murder case is submitted on both theories and the state intends to rely on the underlying felony as the basis for a separate conviction and sentence or as an aggravating circumstance at the sentencing hearing, the trial judge should require the jury to specify which theory or theories it used in arriving at its verdict.

298 N.C. 1, 257 S.E. 2d 569. *Johnson,* then, stands with *Goodman* vis-a-vis the propriety of relying on the underlying felony in the sentencing phase.

**[28]** The trial judge submitted to the jury only one aggravating circumstance; as we have noted, it should not have been submitted. There was, however, evidence of that aggravating circumstance defined by G.S. § 15A-2000(e)(9): "The capital felony was especially heinous, atrocious, or cruel." We considered the meaning of this aggravating circumstance in *State v. Goodman, supra,* 298 N.C. 1, 24-25, 257 S.E. 2d 569, 585 (1979). We said:

> "While we recognize that every murder is, at least argu-
> ably, heinous, atrocious, and cruel, we do not believe that
> this subsection is intended to apply to every homicide. By
> using the word 'especially' the legislature indicated that
> there must be evidence that the brutality involved in the
> murder in question must exceed that normally present in
> any killing before the jury would be instructed upon this
> subsection."

Adopting the Florida and Nebraska view, we concluded in *Good-man* that in order for this aggravating circumstance to apply the murder must be a "conscienceless or pitiless crime which is unnecessarily torturous to the victim." *Id.* at 25, 257 S.E. 2d at 585. We approved in *Goodman* the following jury instruction:

> "You are instructed that the words 'especially heinous,
> atrocious or cruel' means extremely or especially or par-
> ticularly heinous or atrocious or cruel. You're instructed
> that 'heinous' means extremely wicked. or shockingly
> evil. 'Atrocious' means marked by or given to extreme
> wickedness, brutality or cruelty, marked by extreme vio-
> lence or savagely fierce. It means outrageously wicked
> and vile. 'Cruel' means designed to inflict a high degree of
> pain, utterly indifferent to or enjoyment of the suffering
> of others."

We limited the application of this aggravating circumstance in *Goodman* so that it would not become "a catch all provision which can always be employed in cases where there is no evidence of other

State v. Silhan

aggravating circumstances." *Id.* at 25, 257 S.E. 2d at 585.[8]

Noting these principles and the cases in which the aggravating circumstance has been applied, we are satisfied that it could and should have been submitted in this case. The evidence tends to show that before she was murdered, Mary Jo Nancy Coates was stripped from the waist down. Her hands were tied behind her back, and her brassiere was tied around her neck. She was marched at knife point by her assailant into nearby woods where she was forced to lie on the ground. She was beaten before she was murdered. Clearly this murder constituted a "conscienceless" and "pitiless" crime which was "unnecessarily torturous to the victim." *See State v. Goodman, supra.* The jury could have found, had it been given the opportunity to do so, that the murder of Mary Jo Nancy Coates was especially heinous, atrocious, or cruel.

[29]   It is not clear from the record why the "especially heinous" aggravating circumstance was not submitted to the jury. The state in its brief takes the position that the prosecution at trial "did not rely" upon this aggravating circumstance.[9] Suffice it to say that the prosecution in a capital case has no power to withdraw from the jury's consideration any aggravating circumstance which is in fact supported by evidence adduced at the guilt or the sentencing phase. G.S. § 15A-2000(b) provides:

> "(b) *Sentence Recommendation by the Jury.*— Instructions determined by the trial judge to be warranted by the evidence shall be given by the court in its charge to

---

[8] In both *Goodman* and *State v. Johnson,* 298 N.C. 47, 257 S.E. 2d 597 (1979) we concluded that the submission of this aggravating circumstance was proper. In *State v. Oliver & Moore,* 302 N.C. 28, 274 S.E. 2d 183 (1981), however, we concluded that this aggravating circumstance should not have been submitted in one of the murders there involved.

[9] The state takes this position in answer to defendant's contention that the prosecution at trial never properly disclosed those aggravating circumstances upon which it intended to rely. The state in its brief says with reference to the "especially heinous" circumstance:

> "The only other aggravating circumstance the prosecution could have used was that of 'especially heinous,' GS 15A-2000(e)(9). Evidence of this would have been developed earlier in the case; however, *in view of the fact the prosecution did not rely upon this* and the jury did not find it in their sentencing verdict, failure to disclose it was non-prejudicial beyond a reasonable doubt." (Emphasis supplied.)

the jury prior to its deliberation in determining sentence. In all cases in which the death penalty may be authorized, the judge shall include in his instructions to the jury that it must consider any aggravating circumstance or circumstances or mitigating circumstance or circumstances from the lists provided in subsection (e) and (f) which may be supported by the evidence, and shall furnish to the jury a written list of issues relating to such aggravating or mitigating circumstance or circumstances."

Furthermore, the state is without power to agree to a life sentence or to recommend such a sentence to the jury during the sentencing phase "when the state has evidence from which a jury could find at least one aggravating circumstance beyond a reasonable doubt." *State v. Johnson, supra,* 298 N.C. 47, 79, 257 S.E. 2d 597, 619 (1979).[10]

It would also seem that at the new sentencing hearing the state would have evidence of that aggravating circumstance defined by G.S. § 15A-2000(e)(3), *i.e.*, that the "defendant had been previously convicted of a felony involving the use or threat of violence to the person." To take advantage of this aggravating circumstance the state must prove: "(1) defendant had been convicted of a felony . . . (2) the felony for which he was convicted involved the 'use or threat of violence to the person,' and . . . (3) the *conduct* upon which this conviction was based was *conduct which occurred prior to the events out of which the capital felony charge arose.*" *State v. Goodman, supra,* 298 N.C. at 22, 257 S.E. 2d at 583 (emphasis supplied); *see* n. 6, *supra.*

In suggesting the submission of these additional aggravating circumstances at the new sentencing hearing we are not insensitive to the dictates of the Double Jeopardy Clause of the Fifth Amendment, applicable to the states through the Fourteenth Amendment,

---

[10] Where, however, "the state has no evidence of an aggravating circumstance we see nothing in the statute which would prohibit the state from so announcing to the court and jury at the sentencing hearing. Such an announcement must be based on a *genuine lack of evidence* to support the submission to the jury of any of the aggravating circumstances listed in G.S. § 15A-2000(e). Upon such an announcement being made and upon failure of the state to offer evidence of any aggravating circumstance the judge may proceed to pronounce a sentence of life imprisonment without the intervention of the jury." *State v. Johnson, supra,* 298 N.C. at 79-80, 257 S.E. 2d at 620. (Emphasis supplied.)

*Benton v. Maryland*, 395 U.S. 784, 23 L. Ed. 2d 707, 89 S.Ct. 2056 (1969), and the corresponding provision of our own constitution. N.C. Const., Art. I, § 19; *State v. Crocker*, 239 N.C. 446, 80 S.E. 2d 243 (1954).[11]

**[30]**   With regard to criminal *convictions*, if the conviction is reversed on appeal for insufficiency of evidence, the Double Jeopardy Clause precludes remanding the case for a new trial even if the state has evidence which it could offer at a new trial but did not offer at the trial from which the appeal is taken. *Burks v. United States*, 437 U.S. 1, 57 L. Ed. 2d 1, 98 S.Ct. 2141 (1978). There is no such impediment in ordering a new trial when the first trial was tainted by mere "trial error." *Id.* Trial error occurs for purposes of applying the Double Jeopardy Clause when a conviction appealed from was based on a single erroneous legal theory when the state's *evidence* at the first trial would have supported another valid legal theory. *Compare Burks v. United States*, *supra*, with *Forman v. United States*, 361 U.S. 416, 4 L. Ed. 2d 412, 80 S.Ct. 481 (1960); *see State v. Williams*, 224 N.C. 183, 29 S.E. 2d 744 (1944), *aff'd sub nom. Williams v. North Carolina*, 325 U.S. 226, 89 L. Ed. 1577, 65 S.Ct. 1092 (1945).

In *United States v. DiFrancesco*, ____ U.S. ____, 66 L. Ed. 2d 328, 101 S.Ct. 426 (1980) the Supreme Court had occasion to consider the application of the Double Jeopardy Clause to a federal statute permitting the government to appeal a criminal sentence. A majority of the Court concluded that a provision of the Organized Crime Control Act of 1970 authorizing such an appeal of a convicted dangerous special offender's sentence on the ground that the sentence was insufficient did not violate the prohibition against double jeopardy. In reaching this conclusion, the Court discussed at length various principles which had emerged from the Court's earlier double jeopardy decisions. Quoting from *Green v. United States*, 355 U.S. 184, 187-188 (1957), the Court noted:

> "the constitutional prohibition against 'double jeopardy' was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense. . . . The underlying

---

[11] We acknowledge that double jeopardy questions are not now before us, but we discuss them for the guidance of the trial court since they are likely to arise at the new sentencing hearing.

idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty."

The Court observed that while the primary purpose of the clause was "to preserve the finality of judgments . . . 'central to the objective of the prohibition against successive trials' is the barrier to 'affording the prosecution another opportunity to supply evidence *which it failed to muster in the first proceeding.'"*____U.S. at____, 66 L. Ed. 2d at 340, 101 S.Ct. at 432. (Emphasis supplied.) The Court said that the prohibition against double jeopardy consisted "of three separate constitutional protections. It protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *Id.* at ____, 66 L. Ed. 2d at 340, 101 S.Ct. at 433, *quoting from North Carolina v. Pearce*, 395 U.S. 711, 717, 23 L. Ed. 2d 656, 664-665, 89 S.Ct. 2072 (1969). The Court emphasized, *id.* at____, 66 L. Ed. 2d at 340-341, 101 S.Ct. at 433:

> "An acquittal is accorded special weight. 'The constitutional protection against double jeopardy unequivocally prohibits a second trial following an acquittal,' for the 'public interest in the finality of criminal judgments is so strong that an acquitted defendant may not be retried even though "the acquittal was based upon an egregiously erroneous foundation." ' "

We held in *State v. Jones*, 299 N.C. 298, 307-09, 261 S.E. 2d 860, 867 (1980) that "[d]ouble jeopardy considerations precluded a retrial" when a defendant is duly convicted of a capital offense but erroneously sentenced to life imprisonment by the trial judge who failed to conduct a sentencing hearing in the presence of evidence which would have supported at least one aggravating circumstance.

*DiFrancesco*, of course, addresses a problem different from the one with which we deal here. In *DiFrancesco* the Court was

concerned with whether on the government's appeal the likelihood of an increased sentence after a new sentencing hearing contravened double jeopardy prohibitions when both the original sentence was, and the new sentence would be, imposed in the discretion of the trial judge. Here we deal with a defendant's appeal. We are not concerned with the likelihood of an increased sentence nor with the relatively unbridled sentencing discretion of a trial judge in a non-capital case. We are concerned, rather, with a jury's sentencing decision in a capital case. Although the jury's sentencing discretion is not totally eliminated, it is not unbridled. It must be exercised under the guidance of "a carefully defined set of statutory criteria that allow[s] [the jury] to take into account the nature of the crime and the character of the accused." *State v. Johnson, supra,* 298 N.C. at 63, 257 S.E. 2d at 610; *see also State v. Barfield,* 298 N.C. 306, 259 S.E. 2d 510 (1979), *cert. denied,* ____ U.S. ____ (1980). Prerequisite to any jury decision imposing the death penalty the state must prove and the jury must find beyond a reasonable doubt at least one of the enumerated aggravating circumstances listed in G.S. § 15A-2000(e). *State v. Johnson, supra.* The jury must also find beyond a reasonable doubt: (1) the aggravating circumstance(s) is (are) "sufficiently substantial to call for the imposition of the death penalty"; and (2) the mitigating circumstance(s) is (are) "insufficient to outweigh the aggravating" circumstance(s). G.S. § 15A-2000(c); *State v. Johnson, supra,* 298 N.C. at 75, 257 S.E. 2d at 617. That the jury must find three specific things and must find them beyond a reasonable doubt before it can impose the death penalty puts upon the jury in a capital case much the same kind of duty it has in determining a defendant's guilt. The three requirements, in terms of the jury's function, are like the elements of a given criminal offense all of which the jury must find to exist beyond a reasonable doubt before it can return a guilty verdict. This makes our capital sentencing process more like a determination of guilt than like an ordinary discretionary sentencing decision of a trial judge such as that dealt with in *DiFrancesco.* We look, therefore, more to the double jeopardy principles dealing with criminal convictions, many of which were alluded to in *DiFrancesco,* than to the holding of *DiFrancesco* itself. In other words we believe the Double Jeopardy Clause places some limitations on the state in a new capital sentencing hearing ordered because of legal error committed in the hearing from which a defendant successfully appeals.

[31, 32]  Applying the Double Jeopardy Clause jurisprudence just

discussed, we derive the following principles applicable to our capital sentencing procedure: The Double Jeopardy Clause is a limitation on the state's, not the defendant's, power to proceed. If a life sentence is imposed following conviction for a capital crime, the state may not appeal nor may a new sentencing hearing be ordered on defendant's appeal of his conviction even if the life sentence was the result of trial error favorable to defendant.[12] This would be tantamount to defendant's having been acquitted of the death penalty. If upon defendant's appeal of a death sentence the case is remanded for a new sentencing hearing, double jeopardy prohibitions would not preclude the state from relying on any aggravating circumstance of which it offered sufficient evidence at the hearing appealed from and which was either not then submitted to the jury or, if submitted, the jury then found it to exist. The dictates of double jeopardy would preclude the state from relying on any aggravating circumstance of which it offered insufficient evidence at the hearing appealed from. This would be tantamount to the state's having offered insufficient evidence of an essential element of a criminal offense in which case the state, because of double jeopardy considerations, could not retry the defendant even if it had sufficient evidence which could be offered at a new trial. Similarly the prohibition against double jeopardy would preclude the state from relying, at a new sentencing hearing, on any aggravating circumstance the existence of which the jury at the hearing appealed from, upon considering it, failed to find. The jury's failure to find the existence of the aggravating circumstance, after it had considered it, would be tantamount to defendant's having been acquitted of this circumstance.

[33]  In view of the foregoing, if upon defendant's appeal this Court vacates a death sentence for trial error, it will remand for a new sentencing hearing only if there are aggravating circumstances which would not be constitutionally or legally proscribed at the new hearing. An aggravating circumstance would not be so proscribed at the new hearing if (1) there was evidence to support it at the hearing appealed from; and (2) it was not submitted to the jury or, if submitted, the jury found it to have existed; and (3) there is no other

---

[12] This, of course, does not mean that the state and the trial judge may, with impunity, wilfully ignore the clear mandates of our capital sentencing statute. For flagrant, wilful refusals to comply with the statute, remedies other than an appeal, e.g., *mandamus*, may be available.

State v. Silhan

legal impediment (such as the felony murder merger rule) to its use. If all aggravating circumstances would be constitutionally or legally proscribed at the new hearing, this Court will not remand for a new sentencing hearing but will order that a sentence of life imprisonment be imposed. An aggravating circumstance would be so proscribed at the new hearing if either (1) there was no sufficient evidence to support it at the hearing appealed from; or (2) the jury at the hearing appealed from, after considering it, failed to find that it existed; or (3) there would be some other legal impediment (such as the felony murder merger rule) to its use.

[34]  Applying these principles to the case at hand, we have no hesitancy in remanding it for a new sentencing hearing. The prohibition against double jeopardy will not preclude the state from offering evidence of and relying on both the "prior felony" and "especially heinous" aggravating circumstances defined, respectively, by G.S. § 15A-2000(e)(3) and (9). There was evidence of both of these aggravating circumstances at the hearing appealed from. Neither was submitted to the jury.[13]

Defendant may argue at the new sentencing hearing that the "prior felony" circumstance should not be submitted because the jury has somehow resolved this issue against the state when it concluded at the hearing appealed from that defendant had no significant history of prior criminal activity. It is clear from the record that whether defendant had a significant criminal history was the issue to which evidence of the Chatham County convictions was directed.[14]

___

[13] The "prior felony" circumstance may not have been submitted because at the time of the hearing appealed from the convictions were on direct appeal to this Court. The appeal was, however, resolved against defendant and presumably these convictions are now final. See n. 5, supra. We express no opinion on whether the trial court properly failed to submit this circumstance on the ground suggested. Since the appeal has been resolved the question of whether a prior conviction presently on direct appeal may be utilized by the state in a capital sentencing hearing will not arise at the new hearing.

[14] The record supports the conclusion that evidence of the Chatham County convictions was offered not for establishing the "prior felony" aggravating circumstance, but solely for the purpose of disproving the mitigating circumstance that "defendant had no significant history of prior criminal activity." Indeed defendant now argues that it was prejudicial error for the trial judge to have submitted this mitigating circumstance inasmuch as defendant did not ask that it be submitted and never contended that he had no history of prior criminal activity. Defendant argues

The argument must fail. The fact is that the jury was not permitted to consider whether the "prior felony" aggravating circumstance existed. Judge Fountain, for whatever reason, did not submit it. Evidence of the Chatham County convictions was not, furthermore, geared to show that defendant had been formally convicted of the crimes as much as it was offered to show simply that he had been involved in prior criminal activity. The state, for example, never sought to offer the Chatham County court records which would have been the best evidence of defendant's prior convictions. It barely tied evidence of the Chatham County incidents to the "convictions" referred to in Jerry Wooten's testimony on cross-examination. The only connection was Wooten's testimony that he did not know the name of the victims to be "Johnson" until the very morning of his testimony. Thus the jury has not resolved the issue of the "prior felony" circumstance against the state.

**[35]**   We note in this regard that the most appropriate way to show the "prior felony" aggravating circumstance would be to offer duly authenticated court records. Testimony of the victims themselves should not ordinarily be offered unless such testimony is necessary to show that the crime for which defendant was convicted involved the use or threat of violence to the person. There should be no "mini-Trial" at the sentencing hearing on the questions of whether the prior felony occurred, the circumstances and details surrounding it, and who was the perpetrator. Whether a defendant has, in fact, been convicted of a prior felony involving the use or threat of violence to a person would seem to be a fact which ordinarily is beyond dispute. It should be a matter of public record. If, of course, defendant denies that he was the defendant shown on the conviction record, the occurrence of the conviction, or that the crime involved the use or threat of violence to the person, then the state should be permitted to offer such evidence as it has to overcome defendant's denials.

---

that the sole reason for submitting this mitigating circumstance was to permit the state to offer evidence of the Chatham County convictions which, defendant contends, would not otherwise have been admissible. Whatever motive the state might have had in offering this evidence, the fact is that it was offered. Therefore the principle that the state may not at a new sentencing hearing offer evidence of an aggravating circumstance of which there was no sufficient evidence offered at the hearing successfully appealed from does not preclude the state from offering evidence of and relying on this circumstance at the new sentencing hearing.

State v. Silhan

**[36]**  Finally, defendant argues that to admit testimony, in rebuttal, of his bad character, was prejudicial error. After defendant had offered evidence that he had been a good child, a good husband and father, and a good neighbor, the state in rebuttal offered evidence that defendant's general character and reputation in the military was bad. There was no error in admitting this character evidence.

Our capital sentencing statute not only permits but requires juries to determine the sentence guided "by a carefully defined set of statutory criteria that allow them to take into account the nature of the crime and the character of the accused." *State v. Johnson, supra,* 298 N.C. at 63, 257 S.E. 2d at 610. This statute, however, limits the state in its case in chief to proving only those aggravating circumstances listed in section (e).[15] Bad reputation or bad character is not listed as an aggravating circumstance. Therefore the state may not in its case in chief offer evidence of defendant's bad character. A defendant, however, may offer evidence of whatever circumstances may reasonably be deemed to have mitigating value, whether or not they are listed in section (f) of the statute. *State v. Johnson, supra,* 298 N.C. at 72-74, 257 S.E. 2d at 616-617. Often this may be evidence of his good character. *Id.* The state should be able to, and we hold it may, offer evidence tending to rebut the truth of any mitigating circumstance upon which defendant relies and which is supported by the evidence, including defendant's good character. Here, despite defendant's contentions to the contrary, he did offer evidence of his good character. It is true that the evidence was not cast in terms of defendant's reputation in his community. Nevertheless it was evidence tending to show defendant to be, generally, a good person by those most intimately acquainted with him. In face of this evidence, the state was entitled to show *in rebuttal* that defendant's reputation among others familiar with it was not good. Both the state and defendant are entitled to a fair sentencing hearing, and the jury is entitled to have as full a picture of a defendant's character as our capital sentencing statute and constitutional limitations will permit.

Other errors assigned by defendant to the sentencing phase are not likely to arise at the new sentencing hearing; therefore we do not discuss them.

---

[15] Section (e) provides "aggravating circumstances which may be considered *shall be limited* to the following:" (Emphasis supplied.)

## CONCLUSION

The murder case is remanded for a new sentencing hearing to be conducted in a manner not inconsistent with this opinion. Judgment is arrested in the rape case. There is no error in the felonious assault case, nor in defendant's conviction of first degree murder.

DEATH SENTENCE VACATED AND REMANDED FOR A NEW SENTENCING HEARING in Case No. 79-CRS-1943; JUDGMENT ARRESTED in the rape count in Case No. 79-CRS-1943;
NO ERROR in Case No. 79-CRS-1942;
NO ERROR in the guilt phase in Case No. 79-CRS-1943.

Justice MEYER did not participate in the consideration and decision of this case.